1  Matthew L. Sharp
   Nevada Bar No. 4746
2  MATTHEW L. SHARP, LTD.
3  432 Ridge Street
   Reno, NV 89501
4  (775) 324-1500

5
   Thomas J. McKenna
6  *Pro Hac Vice Application to be filed*
   Gregory M. Egleston
7  *Pro Hac Vice Application to be filed*
   GAINEY McKENNA & EGLESTON
8  440 Park Avenue South, 5th Floor
   New York, NY 10016
9  (212) 983-1300
10 **Attorneys for Plaintiff**

11              **UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**
12

13 ROBERT J. CALABRESE,              )   CASE NO.
   Derivatively on Behalf of Nominal )
14 Defendant MEDBOX, INC.,           )
                                     )
15                                   )
              Plaintiff,             )
16                                   )
                                     )   **VERIFIED SHAREHOLDER**
17                                   )   **DERIVATIVE COMPLAINT**
                                     )
18        v.                         )
                                     )
19 NED L. SIEGEL, GUY MARSALA,       )   **JURY TRIAL DEMANDED**
20 J. MITCHELL LOWE, PEJMAN          )
   VINCENT MEHDIZADEH, BRUCE         )
21 BEDRICK, AND JENNIFER S.          )
   LOVE,                             )
22                                   )
23            Defendants,            )
                                     )
24        and                        )
                                     )
25                                   )
26 MEDBOX, INC., a Nevada            )
   Corporation,                      )
27                                   )
28        Nominal Defendant.         )

                    ───────────────────────
              VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
                              1

Plaintiff, on behalf of Medbox, Inc. ("Medbox" or the "Company"), derivatively, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief and investigation of counsel as to all other matters.   That investigation included, among other things, a thorough review and analysis of public documents, United States Securities and Exchange Commission ("SEC") filings, court filings, press releases and news articles concerning Medbox, and the other facts as set forth herein:

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of and for the benefit of Medbox, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties. Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to Medbox.

2.     Medbox was founded in 2010 by Defendant Pejman Vincent Mehdizadeh ("Mehdizadeh"), an Iranian immigrant with a checkered history of business failures and criminal conduct, including grand theft in 2013.

3.     On November 20, 2013, Defendant Mehdizadeh was Medbox's controlling shareholder, owning approximately 65% of its common stock, and served as the Company's Chief Operating Officer ("COO") and Chairman of its Board of Directors ("Board").

4.     During the Relevant Period (November 20, 2013 through the present), Defendants (defined below) caused the Company to issue materially false and misleading statements regarding the Company's financial results for the fiscal year ended December 31, 2013 ("FY 2013") and each of the interim financial periods ended September 30, 2013 ("3Q 2013"), December 31, 2013 ("4Q 2013"), March 30, 2014 ("1Q 2014"), June 30, 2014 ("2Q 2014") and September 30, 2014 ("3Q 2014").  Specifically, Defendants caused the Company to overstate the Company's revenues by recognizing revenue on customer contracts before it had been earned.

5.     On December 30, 2014, Defendants Lowe, Siegel, Marsala and Love caused the Company to issue a press release disclosing that it would be forced to restate the past five quarters of financial reports and potentially its "financial statements for 2012 and for the first two quarters of 2013 . . . as well." The press release further disclosed that the earnings restatement had triggered a default by the Company on its debt covenants that had forced it to seek a forbearance from lenders. The Company press release stated that the "steps [being taken were] part of the continued initiative of [Medbox's] new board of directors and new management team to implement better controls and emphasize transparency."

6.     Since the Company remains under the control and/or influence of the primary wrongdoers who:  (a) caused the Company to make false and misleading statements described below; (b) have substantial conflicts; and/or (c) are implicated in the commission of the wrongful conduct alleged herein, the Company is unable to protect itself or remedy the wrongs inflicted upon it. Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of the Company and for restitution to the Company of, among other things, the costs and expenses that have and will be paid by the Company as a result of Defendants' wrongdoing.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over all claims under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.     This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

9.     Venue is proper in this district because nominal defendant Medbox is incorporated here.

**PARTIES**

10.     *Plaintiff Robert J. Calabrese* is a resident of the state of New Jersey and a current Medbox shareholder.  Plaintiff will continue to hold Medbox shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

11.     *Nominal Defendant Medbox* through its subsidiary Medicine Dispensing Systems, sells patented vending machines that dispense medical marijuana, software and consulting services to pharmacies, alternative medicine dispensaries and local governments in the United States.

12.     *Defendant Ned L. Siegel* ("Siegel") has been a Board member of the Company since April 9, 2014.  On December 17, 2014, Defendant Siegel was appointed Chairman of the Board of the Company.  Defendant Sigel is resident of the state of California.

13.     *Defendant Guy Marsala* ("Marsala") is the Chief Executive Officer ("CEO"), President and a Director of the Company.  On July 23, 2014, Defendant Marsala was appointed to fill a vacancy on the Board and then was elected Chairman of the Board.  Immediately afterwards, Bruce Bedrick resigned as President and CEO of the Company and Defendant Marsala was then appointed President and CEO of the Company.   Defendant Marsala is resident of the state of California.

14.     *Defendant J. Mitchell Lowe* ("Lowe") has been a Director of the Company since March 2014.  Defendant Lowe is resident of the state of California.

15.     *Defendant Jennifer S. Love* ("Love") has been a Director of the Company since October 22, 2014.  Defendant Love was also elected to serve as Chairperson of the Audit Committee.  Defendant Love is resident of the state of Missouri.

16.     Defendants Siegel, Marsala, Lowe, and Love are collectively referred to as the "Director Defendants."

17.     ***Defendant Pejman Vincent Mehdizadeh*** ("Mehdizadeh") is Medbox's controlling shareholder, owning approximately 65% of its common stock, and served as the Company's COO and Chairman of the Board.  On or about April 10, 2014, Defendant Mehdizadeh resigned as COO and as a director of Medbox, but was appointed as "Senior Strategist and Founder" of Medbox.  Then, on October 17, 2014, Defendant Mehdizadeh resigned as an officer of Medbox but continued to serve the Company as a consultant with the title of Founder and Senior Advisor.  Defendant Mehdizadeh is resident of the state of California.

18.     ***Defendant Bruce Bedrick*** ("Bedrick") served as the Company's President and CEO from November 20, 2013 until July 23, 2014, and as a director of Medbox until August 2014, following which Defendant Bedrick continued to serve as a consultant to the Company.   Defendant Bedrick is resident of the state of Arizona.

## **SUBSTANTIVE ALLEGATIONS**

19.     On November 20, 2013, Defendants Mehdizadeh and Bedrick caused the Company to issue a press release announcing the Company's 3Q 2013 financial results for the period ended September 30, 2013, which stated as follows:

> Highlights of 3rd Quarter Financials include:
>
> Revenues surged to over $5.046 million through three quarters, making 2013 the company's best revenue generating year in the company's history.
>
> Revenues reported of $2.079 million for 3rd quarter of 2013, making it the highest grossing quarter in the company's history.
>
> \*        \*        \*
>
> Gross profit margin for the quarter was a healthy $833 thousand and EBITDA margin for the quarter was approximately 21%.

Income from operations through 3 quarters, before taxes, was a healthy $647 thousand.

*"We have had another record breaking quarter, which provides further validation that our business plan is solid and our operating strategy is sound,"* stated Dr. Bruce Bedrick, CEO of Medbox, Inc. "As we move forward, we will continue to seek out opportunities that provide growth for our company and added value for our shareholders."

The company also announced that they have brought accounting functions in-house to help expedite preparation of statements and reports.

"As we continue to mature and transition to being a fully reporting company, we need to be able to provide timely reports, status updates, and filings," Bedrick commented. "We have assembled an in-house team of accounting professionals. This team can devote more time to work seamlessly with our outside auditing firm so that we meet our deadlines and obligations, and provide the most accurate and timely information to the SEC and the general public." [Emphasis added].

20.     On November 25, 2013, Defendants Mehdizadeh and Bedrick caused the Company to issue a press release entitled *Medbox Issues Status Update to Company Shareholders*, which stated that "Medbox posted record revenue figures for YTD 2013, amassing more than $5 million in consulting and equipment sales revenue through 9 months."

21.     Thereafter, in January 2014, the Financial Industry Regulatory Authority ("FINRA") disseminated an advisory regarding risks related to investing in marijuana-related stocks. The FINRA advisory stated:

Like many investment scams, pitches to invest in potentially fraudulent marijuana-related companies may arrive in a variety of ways — faxes, email or text message invitations to webinars, infomercials, tweets or blog posts. Regardless of how you first hear about them, the offers almost always contain hallmarks of "pump and dump"

ploys.   Specifically,   fraudsters   lure   investors   with aggressive,   optimistic — and   potentially   false   and misleading — statements or information designed to create unwarranted demand for shares of a small, thinly traded company with little or no history of financial success (the pump).  Once share prices and volumes reach a peak, the cons behind the scam sell off their shares at a profit, leaving investors with worthless stock (the dump).

22.   On January 13, 2014, to soften the effects of the FINRA advisory concerning the risks related to investing in marijuana-related stocks, Defendants Mehdizadeh and Bedrick caused the Company to issue a press release entitled *Medbox Comments on FINRA Advisory Concerning Marijuana Stocks*, which stated:

> . . . Medbox . . . commented on FINRA's renewed advisory concerning marijuana related stocks.   The advisory, released Friday, highlights what investors should be aware of when investing in marijuana related stocks.

> The [FINRA] advisory stated, in part:

> "We are reissuing this alert to warn investors not only about the potential for fraud in this arena, but also to reiterate the risks of investing in thinly traded companies about which little is known . . . .   One company, for example, promoted its move into the medical cannabis space by issuing more than 30 press releases during the first half of 2013. These releases publicized rosy financial prospects and the growth potential of the medical marijuana market. The company was also touted on the Internet through the use of sponsored links, investment profiles and spam email, including one promotional piece claiming the stock "could double its price SOON" and another asserting the stock was "poised to light up the charts!" Yet the company's balance sheet showed only losses, and the company stated elsewhere that it was only beginning to formulate a business plan."

Other excerpts from the [FINRA] advisory stated, in part: "For example, the CEO of one thinly traded, yet heavily touted, company that purports to be in the medical marijuana business spent nine years in prison for operating one of the largest drug smuggling operations in U.S. history. The former CEO of a similar company was recently indicted for his role in a multimillion dollar mortgage-based Ponzi scheme."

Medbox executives were pleased that a stern advisory was reissued about the sector's stocks by FINRA and had the following comments:

"Some of the public companies in the marijuana sector are in the business of self-promotion with little or no substance or even an executable business plan," stated Vincent Mehdizadeh, Chief Operations Officer at Medbox, Inc. "Since day 1, our company has made its quarterly reports and financials available to the public, kept shareholders diligently informed about the company and its operating personnel at all times, offered ongoing support to its many clients, completed an audit of its financials, donated substantial amounts to industry advocacy groups that support medical marijuana patient rights to safe access of the medicine, and also demonstrated profitability while not deriving revenue from the cultivation or sale of the marijuana itself.  As far as I know, we are the only company in the space to have accomplished those feats. With that being said we have stated in the past that investors should make informed decisions when buying our stock as the volatility may not be something the average retail investor can stomach."

Company executives also pointed out that most, if not all, of the other marijuana related public companies in the sector spend the majority of their operating budgets promoting their stocks through assorted public/investor relations firms and as a result show operating losses quarter after quarter.  Medbox does not have an investor relations firm and according to company executives its general preference has been not to operate with one

through this period in the company's development until a reputable candidate is identified.

"Much of the investor interest in Medbox has occurred through financial press, financial media, and general media coverage chronicling advances in the medical marijuana industry, an industry in which we feel we are the most reputable company," stated Dr. Bruce Bedrick, Chief Executive Officer at Medbox, Inc. "Consequently, we spent much of last year trying to find a reputable firm that would be a good fit to handle our investor relations consistent with best industry practices, and now feel we have found the right fit for our company. We expect to announce more details some time after our Form 10 registration statement is filed with the SEC this week, as that is our main priority at present."

23.     On January 24, 2014, Defendants Mehdizadeh and Bedrick caused the Company to issue a press release entitled *Medbox, Inc. Launches Proactive Investor Relations Program*.  The Company press release announced that Medbox had engaged Hayden IR and RedChipCompanies, Inc., "two independent firms to handle ongoing corporate messaging and investor relations" and "to raise the visibility of Medbox with the investment community."  The Company press release quoted Defendant Bedrick stating that the Company retained these firms as "proven IR counsel" to "help [the Company] raise [its] visibility in the investment community, communicate [its] investment thesis and broaden [its] shareholder base."

24.     On February 18, 2014, Defendants Mehdizadeh and Bedrick caused the Company to issue a press release entitled *Medbox, Inc. Commends Obama Administration for New Guidelines Enabling Banks to Deal with Businesses that Legally Sell Marijuana*, in which the Company complimented the Obama administration "for its forward-thinking action to ease the issues that banks currently have in doing business with dispensary operators which Medbox directly serves." The Company press release referenced rules issued by the Treasury and

1   Justice Departments which the Company stated would open the door for "lawful

2   marijuana businesses to have access to the American banking system."

3        25.    Also on February 18, 2014, *Citron Research* released a report entitled

4   *Busting Medbox*, accusing Medbox of keeping three (3) sets of books and stating

5   that "systemic fraud" and stock promotion had facilitated the Company's then $1

6   billion market capitalization.

7        26.    On that same date, following the publication of the *Citron Research*

8   report, Defendants Mehdizadeh and Bedrick caused the Company to issue a press

9   release entitled *Medbox Responds to Critics and Issues Status Update to Company*

10  *Shareholders*, which stated:

11              Medbox . . . issued a status update to its shareholders on
                past, present, and future projects.  Company executives
12              also commented on bloggers looking to discredit the
                company for financial gain and law firms looking to
13              capitalize on misinformation in order to solicit clients.

14

15              The following is a summary of key events occurring in
                recent weeks:
16

17                  •   Medbox filed its Form 10 with the SEC in
                        January and will be an SEC filer, with all the
18                      burdens and benefits that result from that
                        status, as of mid-March 2014.
19

20                          *       *       *

21

22              Company executives clarified their position on the
                restatement of financials that accompanied the Form 10
23              registration statement filed with the SEC as a maturation
                process in becoming an SEC filer.
24

25              "The company undertook a project to bring all accounting
                functions in house and during that lengthy process we
26              discovered some errors in accounting which we have since
                corrected in the latest financials included in the Form 10.
27              The point is getting it right and being fully transparent with
                our shareholders at all times," stated Vincent Mehdizadeh,
28

Board Chairman at Medbox, Inc. "The company has, as part of those corrections, instituted better controls over financial reporting to avoid further corrections. In addition, it is important to note that revenues for the nine months of 2013 had increased over the comparative period of the prior year (as corrected) and we are continuing to add skilled people to accelerate our growth in 2014. Unfortunately, when you are the most visible company in the space, with a large market capitalization, you become a target."

***Company executives caution company shareholders that while the media has been extremely supportive of Medbox as one of the only viable medical marijuana related public companies, with success there will always be opponents that publish deceptive and misleading articles about the company and its executives.***

In addition, company executives clarified that the company offers support services to the medical marijuana sector on an arm's length basis. Often times in a state where applications are being accepted for marijuana dispensary licensing, some landlords would not lease to the newly formed non-profit entities formed for the company's clients. As a result, in some rare instances and simply as an absolute benefit to their clients, it was agreed that Medbox would lease the properties and assign all rights to the applicant, with the permission of the landlord.

"We go the extra mile for our clients and that is evident through our glowing testimonials displayed on our websites," stated Dr. Bruce Bedrick, CEO at Medbox, Inc. "Interestingly, with the recent banking policy guidance by the federal government, we can now start to develop an additional revenue stream of acquiring properties and leasing to our dispensary operator clients. This is one of many revenue streams that Medbox is actively developing given the current climate and relaxed federal posture." [Emphasis added.]

27.   Following this news, the Company's shares decreased from an opening price of $33.42 per share to close at $29.80 per share on February 18, 2014.

28.   On March 10, 2014, Defendants Mehdizadeh and Bedrick caused the Company to issue a press release entitled *Medbox Issues Shareholder Update – Board to Pursue Listing on Major National Exchange During 2014*. The Company press release stated:

> SEC reporting status, and other strategic items:
>
> The Company's Form 10 registration statement filed with the SEC will be effective as of March 22, 2014. The Company expects to respond to SEC comments and file audited 2013 year-end financials on a Form 10-K by the end of March.
>
> The board of directors is seeking to list Medbox with the NASDAQ Capital Markets or another national exchange by the end of 2014.
>
> The Company added public company experience with the additions of Thomas Iwanski at CFO, Matt Feinstein at Vice President, and also Mitch Lowe as the Company's first independent director.
>
> \*       \*       \*
>
> "The last 90 days have been highly productive, and Medbox continues to lead this burgeoning new industry," stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. "We continue to take the steps to set Medbox apart from others in the industry, ensuring that we have the appropriate controls and resources in place and adding seasoned talent to lead future growth."
> Dr. Bruce Bedrick, Medbox President and CEO, added, "With the effectiveness of our Form 10 later this month, Medbox will be a fully reporting company. Our pending status as a future SEC filer, as well as key additions to our management team, are important steps for strengthening

the legitimacy of Medbox and increasing our ability to reach new investors and clients. We look forward to continuing to exceed expectation in the coming months."

29. On March 26, 2014, Defendants Mehdizadeh, Bedrick and Lowe caused the Company to issue a press release entitled *Medbox Completes SEC Filing Requirements – Company's amended Form 10 registration statement and audited 2013 financials to be filed with SEC by March 31, 2014*, which stated:

> . . . Medbox . . . today announced that it has completed the requisite steps to formally become a fully-reporting company as of March 24, 2014 and is now subject to the Securities and Exchange Commission reporting requirements.
>
> On March 25, 2014, Medbox filed its requisite Form 3's. The Company expects to file its amended Form 10 registration statement, along with audited full-year 2013 financials, by March 31, 2014.
>
> "This is a key step in our goal of listing our shares on a national exchange, and further evidence of our goal to maintain the highest standards for corporate governance and transparency," stated Vincent Mehdizadeh, Chairman and COO of Medbox, Inc. "It is of special importance to me personally that we are one of the only fully reporting public companies that has generated considerable revenues in the marijuana ancillary services sector and demonstrated an executable business plan. Our main subsidiary, Medicine Dispensing Systems, has turned a profit every year since commencing operations in 2010. These key differences set us apart from our competitors."

30. On March 31, 2014, Defendants Mehdizadeh, Bedrick and Lowe caused the Company to file a Form 10 with the SEC reporting its fiscal 2013 financial results. The Form 10 stated that "[r]evenue increased $2,633,196, or 101.65%, to $5,223,775 for the twelve months ended December 31, 2013, from $2,590,579 for the twelve months ended December 31, 2012, primarily as a result of the completion of contracts for [its] Arizona customers" and that the "main

1    reason for the increase in revenues was a change in volume, because there were no

2    changes in pricing policies."

3        31.    On April 1, 2014, Defendants Mehdizadeh, Bedrick and Lowe caused

4    the Company to issue a press release announcing its 4Q and fiscal 2013 financial

5    results for the period ended December 31, 2013 entitled *Medbox Generates 102%*

6    *Increase in Revenue for Fiscal 2013 – Company increases inventory, expands sales*

7    *and marketing infrastructure, to set the stage for additional growth.*  The Company

8    press release stated as follows:

> . . . Medbox . . . today announced record full-year revenue.
> Medbox included its audited numbers for the year ended
> December 31, 2013 in its amended Form 10 filing with the
> Securities and Exchange Commission.
>
> Recent Operational highlights:
>
> On March 24, 2014, the Form 10 registering Medbox's
> shares of common stock became effective with the
> Securities and Exchange Commission and Medbox is now
> a fully-reporting public company.
>
> The Company added public company experience, naming
> Thomas Iwanski as CFO, Matt Feinstein at Vice President,
> and also Netflix co-founder and former Redbox president
> Mitch Lowe as the Company's first independent director.
>
> *                *                *
>
> "This was a productive and exciting year for Medbox, and
> the first 90 days of 2014 have been even more productive,"
> commented Dr. Bruce Bedrick, Chief Executive Officer of
> Medbox.  "We have solidified our position as the industry
> leader, and in the last three months we have taken specific
> steps to improve corporate governance, expand
> transparency and deliver shareholder value.  During the
> rest of 2014 we will grow organically, taking advantage of
> the tremendous momentum in the industry.  We will also
> leverage our reputation, presence in the industry, and our
> relationships to develop new revenue streams.  This will be

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
14

an exciting year for Medbox, its clients and its shareholders."

Full-year revenues were $5.2 million, a 101.7% increase compared to $2.6 million last year. The increase in revenues was due primarily to the result of recognizing revenue deferred from 2012 related to the completion of contracts for Arizona customers which was delayed by court action that was not resolved until 2013. Gross profit for 2013 was $2.6 million, or 50.5% gross profit margin, compared to gross profit of $1.5 million, or 59.4% gross profit margin for 2012.

The change in gross profit margin was due to increased costs related to the build-out of locations for clients and delays in implementing the Arizona program related to the litigation.

Total selling, general and administrative expenses were $3.2 million, or 61.2% of total revenues, compared to total selling, general and administrative expenses of $1.9 million, or 72.5% of total revenues last year. The loss from operations for the year was $(560,000), compared to a loss from operations of $(340,000) last year. Net loss for the year was $(557,000), or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss last year of $(344,000), or $(0.01) per basic and diluted share, last year.

While the Company's largest operating subsidiary, Medicine Dispensing Systems, remained profitable with a pretax profit of $948,443, the net loss for 2013 included $1.2 million in losses from the parent company's operations, related primarily to accounting and SEC attorney legal fees (related to the filing of, and subsequent withdrawing of, a Registration Statement on Form S-1, and the filing of a Form 10 registration statement in order to register the common stock of Medbox) and additional legal fees (related to litigation on behalf of Arizona clients to allow them to move forward with dispensary licenses the state of Arizona had awarded). In addition, the Company's Vaporfection subsidiary, acquired on April 1, 2013,

recognized a net loss of $317,000 for nine months of operations.

"Our primary subsidiary, Medicine Dispensing Systems, has been profitable each year since commencing operations in 2010, and remains profitable today," added Vincent Mehdizadeh, Chairman and Chief Operating Officer of Medbox, Inc. "However, public company costs, expenses related to financing efforts, and legal fees related to Arizona litigation resulted in a net loss for the public company. We do not expect these expenses to impact our 2014 results, however, we are growing our infrastructure in anticipation of future growth, and expect additional fees related to public company costs as the Company pursues a listing on a national exchange.

Fourth Quarter Financial Results

Revenues for the fourth quarter ending December 31, 2013 increased to $423,000 compared to $47,250 for the same period of 2012. The increase in revenues was due to an increased number of contracts signed and initial nonrefundable consulting fees. Gross profit for the quarter was $278,000, or 65.7% gross profit margin, compared to a negative gross profit of $(508,000), or (10.8%) negative gross profit margin, in the fourth quarter of 2012. This was partially due to deferral of some revenue for Arizona contracts from 2012 to 2013 because of Arizona licensing stoppages by their authorities.

Total selling, general and administrative expenses significantly increased by $657,007 in the fourth quarter of 2013 compared to the same period of 2012, this is due to the fact that the Company incurred higher general and administrative expenses related to raising capital and regulatory compliance as described above.

Net loss for the fourth quarter of 2013 was $(513,000) or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss of $(533,000) or $(0.02) per basic and $(0.01) per diluted share for the fourth quarter of 2012.

32.   On or about April 10, 2014, Defendant Mehdizadeh resigned as COO and as a director of the Company, but was appointed as "Senior Strategist and Founder" of Medbox.

33.   On May 15, 2014, Defendants Mehdizadeh, Bedrick, Lowe and Siegel caused the Company to issue a press release announcing its 1Q 2014 financial results for the period ended March 31, 2014.  The Company press release stated:

> Recent Operational Highlights:
>
> *          *          *
>
> On March 24, 2014, the Form 10 registering Medbox's shares of common stock became effective with the Securities and Exchange Commission and Medbox is now a fully-reporting public company.
>
> *          *          *
>
> Began providing company information via S&P Capital IQ Corporation Records Listing Program to increase visibility to the institutional investment community.
>
> *          *          *
>
> "We continued to establish the company as the leader in the rapidly growing legitimate marijuana industry while increasing our transparency to the investment community and position in the capital markets," commented Dr. Bruce Bedrick, Chief Executive Officer of Medbox. "As this industry continues to evolve and redefine itself, Medbox is strategically positioned as the partner of choice with a growing array of solutions, technologies and services."
>
> Dr. Bedrick continued, "Across the country, states and municipalities evolve regulations regarding medical and recreational marijuana, and often struggle with the best ways to manage this change and address reasonable concerns.   The results we are reporting today are somewhat   overshadowed   by   accounting   provisions

necessitated by changes in the business and legal environment in one of the markets in which we operate. Medbox stands at the forefront of this industry, offering solutions that help dispensary operators and cultivators maintain compliance and records that exceed regulatory requirements."

First Quarter Financial Results

First quarter gross revenues were $1.3 million, a 3.9% increase compared to $1.2 million in the first quarter of 2013.

Due to changes in a final adopted ordinance in the San Diego market, the total number of licenses to be awarded by the city was reduced by over 75% as well as the likelihood of securing properly zoned locations. As a result of not being able to satisfy the demand of the company's clients in that market, Medbox recorded a provision for sales allowances of approximately $963,000, resulting in a reduction of revenues for the quarter.

\*     \*     \*

Net loss for the first quarter of 2014 was $(1.3) million or $(0.04) per basic and $(0.03) per diluted share, compared to a net loss of $(330,380) or $(0.01) per basic and $(0.01) per diluted share for the first quarter of 2013.

34.     On May 15, 2014, Defendants Mehdizadeh, Bedrick, Lowe and Siegel caused the Company to file a quarterly financial report with the SEC on Form 10-Q reporting financial results significantly similar to those reported in the May 15, 2014 Company press release.

35.     On May 16, 2014, the SEC issued a report warning of "possible scams involving marijuana-related investments[,]" quoting Elisha Frank, co-chair of the SEC Enforcement Division's Microcap Fraud Task Force as stating "[w]henever we see incomplete or misleading disclosures, we act quickly to protect investors."

36.   On July 1, 2014, Defendants Mehdizadeh, Bedrick, Lowe and Siegel caused the Company to issue a press release entitled *Medbox Becomes a Fully Reporting Public Company – Company's Form 10 deemed effective by SEC*, which stated:

> . . . Medbox . . . today announced that the company's Form 10 filing has been deemed effective by the Securities and Exchange Commission, with no outstanding comments left to address.
>
> Dr. Bruce Bedrick, CEO of Medbox, commented, "This step is another milestone for our Company as we continue to build market leadership in the cannabis industry. We believe that compliance and transparency are important . . . for Medbox to grow as a public company."

37.   On July 24, 2014, the Company announced that Defendant Bedrick was stepping down as the Company's President and CEO and that Guy Marsala would take his place. The Company also announced that Defendant Marsala had been appointed to the Board and subsequently elected to serve as its Chairman. Following his resignation as President and CEO of the Company, in August 2014, Defendant Bedrick also stepped down from Medbox's Board. Defendant Bedrick, however, remained with the Company as a "consultant."

38.   On August 15, 2014, Defendants Mehdizadeh, Lowe, Siegel and Marsala caused the Company to issue a press release entitled *Medbox Files 10-Q and Announces Quarterly Conference Call*. The Form 10-Q Medbox filed with the SEC that day for the financial period ended June 30, 2014 was signed by Defendant Marsala and reported that the Company had achieved revenues of $434,448 and a net loss of $1.4 million in 2Q 2014. The Management Discussion and Analysis ("MD&A") section of the Form 10-Q stated that "[r]evenue was down for the current period as delays in adoption of final regulations in certain states and the ultimate timing of the application process in states with final regulations reduced and delayed the opportunity to apply for new licenses and consequently delayed the

1  notice of the results of any license application made." The MD&A section also
2  stated that "revenue was further reduced by additional sales allowances and refunds
3  recorded due to a legislative change in the San Diego market area which reduced
4  the ability of certain clients to obtain licenses and triggered certain contract
5  refunds."

6  39.  On October 17, 2014, the Company disclosed that Defendant
7  Mehdizadeh had resigned as an officer of Medbox but that he would continue to
8  serve the Company as a consultant with the title of "Founder and Senior Advisor."

9  40.  On October 31, 2014, Defendants Lowe, Siegel, Marsala and Love
10  caused the Company to file a Form 8-K with the SEC disclosing that on October
11  27, 2014, the Board appointed a special board committee to investigate "(i) a letter
12  from a former Company employee to the Securities and Exchange Commission
13  alleging wrongdoing by a former officer of the Company who is currently a
14  consultant to the Company, and (ii) a federal grand jury document subpoena served
15  in August 2014 on the Company's accountants by the U.S. Department of Justice,
16  to ascertain what implications, if any, the subpoena or the letter may have with
17  respect to the Company."

18  41.  On November 3, 2014, Defendants Mehdizadeh, Lowe, Siegel,
19  Marsala and Love caused the Company to issue a press release entitled *Medbox*
20  *Comments on Recent 8-K Filing*. The Company press release attempted to
21  minimize the potential impact of the letter from the former employee to the SEC,
22  quoting Defendant Mehdizadeh who stated that "[t]he former employee vowed to
23  retaliate against the Company in any way he could after his illegal cash demands of
24  the company were ignored. It now appears that writing a letter to government
25  agencies filled with factual inaccuracies and blatant falsehoods was the most
26  effective way to facilitate that goal." The Company press release also noted that
27  "[c]urrent management commented that the Company ha[d] not found any
28  indications that the subject matter contained in the [former employee's] letter [was]

true concerning the conduct of prior officers of the company." With respect to the subpoena served in August 2014 on the Company's accountants by the U.S. Department of Justice, the Company, in the press release "clarified that no subpoenas have been served on the Company, it's current or former officers, or anyone affiliated to the Company." The Company press release ends by quoting Defendant Mehdizadeh, who reassures that he:

> "painstakingly put together the best management team and Board of Directors in our sector for a reason, and in their judgment this voluntary disclosure is what good public companies that have nothing to hide should do. The company will continue to demonstrate to shareholders, the investment community, and all other public company participants in the cannabis sector, how a well-run and respectable public company should operate. Medbox has and will continue to be the gold-standard for accountability."

42.     Despite the Company press release on November 3, 2014, Medbox stock still closed down at $12.45 per share from its previous close of $13.95 per share on October 31, 2014. The Company shares continued to fall as the financial media reported on the ensuing SEC investigation and the market absorbed the full import of the disclosures, with the price of the Company stock closing at $9.20 per share on November 5, 2014.

43.     On November 7, 2014, Defendants Lowe, Siegel, Marsala and Love caused the Company to file a Current Report on Form 8-K with the SEC which stated "[t]he news release issued Monday, November 3, 2014 under the headline 'Medbox Comments on Recent Form 8-K Filing' was not authorized by Medbox, Inc. (the 'Company') for distribution. The Form 8-K filed by the Company on Friday, October 31, 2014, should be used as a reference for information regarding this matter. The filing is available on the website of the Securities and Exchange Commission."

44.     On November 12, 2014, Defendants Lowe, Siegel, Marsala and Love caused the Company to file a quarterly financial report on Form 10-Q with the SEC reporting its financial results for its 3Q 2014 ended September 30, 2014.  The Form 10-Q stated that the Company had achieved net revenues of $107,429 and a net loss of $3.2 million for the quarter. The MD&A section of the Form 10-Q also stated:

> Revenue was down for the current period partially due to delays in adoption of final regulations in certain states and delays in approving license applications.  Additionally, the Company's revenue model is significantly different in the third quarter of 2014 as compared to third quarter of 2013. This difference is mainly due to the fact that the Company is moving away from the business model of obtaining licenses for clients for a onetime upfront fee. The Company is in the process of modifying its business model to provide ongoing management and support services for clients so that the consulting contract would continue in perpetuity.  During the transition period to a new business model, expenses to secure new contracts and licenses are incurred and revenue is deferred principally until new licenses are obtained and new dispensaries and cultivation centers begin operating.

45.     The true facts were as follows:

a)     The Company was recognizing revenue before it was earned on certain customer contracts;

b)     The Company lacked effective internal controls;

c)     Due to its false financial reporting, the Company was not complying with Generally Accepted Accounting Principles ("GAAP") or SEC rules and regulations and, as such, was not eligible for listing on a national stock exchange;

d)     Due to its financial misstatements, the Company was not in compliance with its debt covenants; and

e)     As a result, the Company was not on track to achieve its financial targets during the Class Period.

46.     On December 30, 2014, Defendants Lowe, Siegel, Marsala and Love caused the Company to issue a press release entitled *Medbox, Inc. to Amend and Restate Prior Period Financial Statements*.  The Company press release stated:

> Medbox . . . today announced it will amend and restate its financial statements for the year ended December 31, 2013, the third and fourth quarters of 2013 and the first three quarters of 2014.

> In October, 2014, the Board of Directors of the Company appointed a special board committee (the "Special Committee") to investigate a federal grand jury subpoena pertaining to the Company which was served upon the Company's accountants, as well as certain alleged wrongdoing raised by a former employee of the Company. Thereafter, the Company received subpoenas from the federal grand jury and the Securities and Exchange Commission.  In connection with its investigation of these matters, the Special Committee, in conjunction with the Audit Committee, initiated an internal review by management and by an outside professional advisor of certain prior period financial reporting of the Company. Medbox's audit committee, upon management's recommendations, has concluded that the consolidated financial statements for the year ended December 31, 2013 and for the third and fourth quarters of 2013 as well as for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014, should no longer be relied upon and will be restated to correct the errors.  As part of the investigative process, Medbox will also examine the financial statements for 2012 and for the first two quarters of 2013 and, if necessary, correct those as well. The company intends to correct the errors in its financial statements to bring them into conformity with accounting principles generally accepted in the United States of America (GAAP) and SEC regulations.  Medbox plans to engage an independent CPA firm to consult with and assist the Company's staff with preparing restated financial statements as soon as possible.

Medbox stated that it appeared that revenue had been recognized too soon on some customer contracts. The restated financial statements will recognize revenue at a later time as up-front payments are recognized over the longer of the contract period or the customer relationship, revenue is deferred until key contingencies are removed and it is clear the revenue has been earned in accordance with GAAP and SEC regulations. Other adjustments to its financial statements are also possible in connection with the Company's ongoing review of its prior period financial statements.

The Company's announcement that prior period financial statements can no longer be relied upon permit the Company's existing lenders to trigger default remedies, however, the Company's lenders have agreed to forbearance on declaring a default pending conclusion of on-going discussions to refinance the Company.

Guy Marsala, CEO of Medbox commented, "The steps we are announcing today are part of the continued initiative of our new board of directors and new management team to implement better controls and emphasize transparency. Improved processes and controls contributed to our ability to uncover these errors and bring them to the attention of our independent auditors and audit committee."

47.     On this news, the price of the Company stock declined as low as $4.50 per share on December 30, 2014, closing at $6.39 per share, ***down $89 per share from its January 8, 2014 high of $93.50*** per share – representing a market capitalization loss of more than $2.8 billion.

## CORPORATE GOVERNANCE

48.     Pursuant to the Company's Corporate Governance and Nominating Committee Charter, "[t]he primary purposes of the Corporate Governance and Nominating Committee (the 'Committee') of the Board of Directors (the 'Board') of Medbox, Inc. (the 'Company') are to (1) recommend to the Board persons to serve as members of the Board, (2) assist the Board in evaluating the performance

of the Board and (3) review and make recommendations to the Board on corporate governance matters."

49.     The Corporate Governance and Nominating Committee Charter further states:

> Authority and Responsibilities
>
> The Board delegates certain responsibilities and duties to the Committee to assist the Board in fulfilling its oversight responsibilities. The responsibilities of the Committee shall include:
>
> 1.     Identify the skill set, qualifications and other criteria which should be present in the Board and identify gaps between the current and desired skill set, qualifications and other criteria.
> 2.     Develop a Board recruitment strategy and oversee search activity, including reviewing the qualifications of potential candidates and interviewing candidates.
> 3.     Formulate and recommend for adoption to the Board a policy regarding the qualifications, skills and other attributes the Company seeks in nominees for election to the Board.
> 4.     Recommend to the Board:
>        • the persons to be nominated by the Board for election to the Board by stockholders at each annual meeting of stockholders and
>        • the persons to be appointed to fill any vacancy on the Board which shall occur for any reason.
> 5.     Formulate and recommend for adoption to the Board a policy regarding consideration of nominees for election to the board of directors who are recommended by security holders of the Company and consider the recommendation of Board candidates submitted from the stockholders of the Company in accordance with such policies.
> 6.     Recommend appointments to committees of the Board and chairpersons for such committees.

7. Review the appropriateness of Board committees and the need for additional committees.

8. Review from time to time the size and composition of the Board and recommend any changes it deems advisable.

9. Annually review the status of each member of the Board as independent or not independent and submit a report on the subject to the Board.

10. Review any meaningful change in the professional circumstances or job responsibilities of each of the directors and recommend appropriate action, if any, to the Board.

11. Facilitate an annual assessment by Board members of the performance of the Board and the Board committees.

12. Develop and recommend a CEO succession plan to the Board.

13. Advise the Board regarding the appropriate board leadership structure for the Company, including whether the Board should have an independent chairman.

14. Review and assess corporate governance policies for the Company, including the Company's Code of Ethics and recommend any proposed changes to the Board for approval.

15. Be available to the Board and members of the Company's senior management team to consult with and to resolve reported violations or instances of non-compliance with the Company's Code of Ethics.

16. Exercise authority to hire and terminate any search firm or other advisor to be used to help the Committee carry out its responsibilities.

17. Report to the Board on a regular basis and make such recommendations with respect to any of the above and other matters as the Committee deems necessary or appropriate.

18. Perform other responsibilities reasonably related to the responsibilities specified above or otherwise delegated to the Committee by the Board.

50. The Board has an Audit Committee, a Compensation Committee and a Corporate Governance Committee. Each committee performs its duties as assigned by the Board in compliance with the Company's Bylaws, and has a charter that establishes the purposes, goals and responsibilities of the committees as well as the qualifications for committee membership. Committee charters are posted on the Company's website. The Board may establish or maintain additional committees from time to time as necessary or appropriate.

**Likelihood of Substantial Liability of the Compensation Committee**

51. The Compensation Committee members of the Board are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action as they have disabling conflicts of interest, and have allowed and approved improper and excessive executive compensation.

52. The Board and its various committees are currently comprised as follows:

|  | Audit Committee | Compensation Committee | Governance and Nominating Committee |
|---|---|---|---|
| Sigel | Member | Member | Chairperson |
| Lowe |  | Chairperson | Member |
| Love | Chairperson |  |  |

53. As members of the Compensation Committee, Defendants Siegel and Lowe were responsible for determining the executive officers' salaries, bonuses, stock awards, incentive and other compensation. Pursuant to the Company's Charter of the Compensation Committee adopted by the Board, the Compensation Committee is responsible for, among other things:

1. Establish the Company's executive compensation philosophy, oversee the Company's processes and procedures for consideration and determination of executive and director compensation and review and approve all executive compensation and submit it to

the Board for its information. In considering and reviewing executive compensation, the Committee shall take into account the objectives of the Company's compensation programs and all factors it deems relevant to the determination of executive compensation including:

- What the Company's compensation program is designed to reward;
- Each element of compensation and why the Company pays each element;
- How the Company determines the amount to pay for each element; and
- How each compensation element and the Company's decisions regarding that element fit into the Company's overall compensation objectives and affect decisions regarding other elements.

2.   Annually, and without the CEO present, review and evaluate the CEO's performance relative to Company goals and objectives, review and discuss the results of such evaluation with the CEO, establish the individual elements of the CEO's total compensation based, in part, on this evaluation and review and approve CEO compensation.

3.   Administer and implement the Company's incentive compensation plans and equity-based plans, including, but not limited to:

- establishing the performance objectives and weightings utilized in such plans and reviewing achievement of such performance objectives;
- determining the form of payouts under such plans;
- approving form award agreements to be used to document awards;
- approving option grants and restricted share or other awards;
- interpreting the plans;
- determining rules and regulations relating to the plans, including establishing grant processes and procedures;

- approving the modification or cancellation of existing grants or awards; and
- imposing limitations, restrictions and conditions upon any grant or award as the Committee deems necessary or advisable.

4. Review and monitor the Company's employee benefit plans and policies, provide oversight of any employee benefit plan, and review and approve adoptions of, and any material amendments to such plans.

5. Advise on the setting of compensation for officers whose compensation is not subject to Committee approval.

6. Review and approve, for the CEO and other executive officers of the Company, employment agreements, severance agreements and change in control agreements.

7. Periodically evaluate and recommend to the Board appropriate compensation for the Company's directors, including compensation and expense reimbursement policies for attendance at Board and committee meetings.

8. Provide the Compensation Committee Report required to be included in the Company's annual proxy statement.
Report to the Board on a regular basis and make such recommendations with respect to any of the above and other matters as the Committee deems necessary or appropriate.

9. Perform other responsibilities reasonably related to the responsibilities specified above or otherwise delegated to the Committee by the Board or required under the provisions of any compensation or benefit plan maintained by the Company.

**DUTIES OF DEFENDANTS**

54. By reason of their positions as officers, directors, and/or fiduciaries of Medbox and because of their ability to control the business and corporate affairs of Medbox, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to

use their utmost ability to control and manage Medbox in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Medbox and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

55.   Each director and officer of the Company owes to Medbox and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

56.   Defendants, because of their positions of control and authority as directors and/or officers of Medbox, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Medbox, each of Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Medbox.

57.   To discharge their duties, the officers and directors of Medbox were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Medbox were required to, among other things:

a)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and

1  disseminating truthful and accurate statements to the SEC and the investing

2  public;

3     b)  conduct the affairs of the Company in an efficient, business-

4  like manner so as to make it possible to provide the highest quality performance

5  of its business, to avoid wasting the Company's assets, and to maximize the value

6  of the Company's stock;

7     c)  properly and accurately guide investors and analysts as to the

8  true financial condition of the Company at any given time, including making

9  accurate statements about the Company's business prospects, and ensuring that

10  the Company maintained an adequate system of financial controls such that the

11  Company's financial reporting would be true and accurate at all times;

12     d)  remain informed as to how Medbox conducted its operations,

13  and, upon receipt of notice or information of imprudent or unsound conditions or

14  practices, make reasonable inquiry in connection therewith, take steps to correct

15  such conditions or practices and make such disclosures as necessary to comply

16  with federal and state securities laws; and

17     e)  ensure that the Company was operated in a diligent, honest

18  and prudent manner in compliance with all applicable federal, state and local

19  laws, rules and regulations.

20    58.  Each Defendant, by virtue of his/her position as a director and/or

21  officer, owed to the Company and to its shareholders the fiduciary duties of

22  loyalty, good faith, and the exercise of due care and diligence in the management

23  and administration of the affairs of the Company, as well as in the use and

24  preservation of its property and assets.  The conduct of Defendants complained of

25  herein involves a knowing and culpable violation of their obligations as directors

26  and officers of Medbox, the absence of good faith on their part, and a reckless

27  disregard for their duties to the Company and its shareholders that Defendants

28

1  were aware or should have been aware posed a risk of serious injury to the

2  Company.

3       59.    Each director and officer of the Company owed to Medbox the

4  fiduciary duty to exercise due care and diligence in the administration of the affairs

5  of the Company and in the use and preservation of its property and assets, and owed

6  to Medbox the highest obligations of good faith and fair dealing.  In addition, as

7  officers and/or directors of a publicly held company, Defendants had a duty not to

8  advance their own personal, financial, or economic interests over, and at the

9  expense of, the Company's public shareholders, or to allow other Medbox

10  directors, officers, and/or employees to do so.  Each director and officer of the

11  Company also owed Medbox and its shareholder-owners the duty to maintain the

12  Company's confidential information and prevent others from misappropriating

13  and/or trading while in possession of the Company's proprietary, confidential

14  information.

15       60.    Defendants breached their duties of loyalty and good faith by

16  causing the Company to misrepresent the information as detailed *infra*.

17  Defendants' subjected the Company to the costs of defending and the potential

18  liability from a class action lawsuit for violations of the federal securities laws.

19  As a result, Medbox has expended, and will continue to expend, significant sums

20  of money.

21       61.    Defendants' actions have irreparably damaged Medbox's corporate

22  image and goodwill.  Moreover, Defendants have misled the investing public to

23  such an extent that Medbox's ability to raise equity capital or debt on favorable

24  terms in the future is now impaired.

25  **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

26       62.    In committing the wrongful acts alleged herein, Defendants have

27  pursued, or joined in the pursuit of, a common course of conduct, and have acted

28  in concert with and conspired with one another in furtherance of their common

1   plan or design.  In addition to the wrongful conduct herein alleged as giving rise
2   to primary liability, Defendants further aided and abetted and/or assisted each
3   other in breaching their respective duties.

4        63.    Defendants collectively and individually initiated a course of
5   conduct that was designed to and did, or as a result of their reckless or grossly
6   negligent behavior did:  (i) conceal the fact that the Company was improperly
7   portraying the information described herein; (ii) maintain Defendants' executive
8   and directorial positions at Medbox and the profits, power and prestige that
9   Defendants enjoyed as a result of these positions; and (iii) deceive the investing
10  public, including shareholders of Medbox, regarding Defendants' management of
11  Medbox's operations, the Company's financial health and stability, and future
12  business prospects.

13       64.    Defendants engaged in a conspiracy, common enterprise, and/or
14  common course of conduct, pursuant to which they caused the Company to
15  conceal the fact that Medbox was misrepresenting the described information
16  herein and that Defendants had breached their fiduciary duties in managing the
17  affairs of the Company.  Further, Defendants took actions that were not the
18  product of valid business judgment, but rather, the result of a desire to obtain
19  personal profits and perquisites.

20       65.    The purpose and effect of Defendants' conspiracy, common
21  enterprise, and/or common course of conduct was, among other things, to
22  disguise Defendants' violations of law, breaches of fiduciary duty, waste of
23  corporate assets, abuse of control, gross mismanagement and unjust enrichment,
24  and to conceal adverse information concerning the Company's operations,
25  financial condition, and future business prospects.

26       66.    Defendants accomplished their conspiracy, common enterprise,
27  and/or common course of conduct by causing the Company to purposefully,
28  recklessly, or with gross negligence misrepresent its business prospects and

release improper statements, taking actions that were not the product of valid business judgment and failing to properly manage the affairs of the Company. Because the actions described herein occurred under the authority of the Board and/or the Company's officers, each of Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

67.    Each of Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

68.    Defendants owed to Medbox a duty to insure that the Company's financial reporting and disclosures fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

### DERIVATIVE AND DEMAND FUTILITY
### ALLEGATIONS FOR THE BOARD OF MEDBOX

69.    Plaintiff will adequately and fairly represent the interests of Medbox and its shareholders in enforcing and prosecuting its rights.

70.    Plaintiff brings this action derivatively in the right and for the benefit of Medbox to redress injuries suffered and to be suffered by Medbox because of the breaches of fiduciary duty by Defendants.

71.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board of Medbox to institute this action against the Director Defendants. Such demand would be a futile and useless act because the Board is incapable of

making an independent and disinterested decision to institute and vigorously prosecute this action.

72.    The Medbox Board is currently comprised of Defendants Siegel, Marsala, Lowe, and Love.   Thus, Plaintiff is required to show that a majority of Defendants, *i.e.,* three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

73.    Defendants face a substantial likelihood of liability in this action because they caused Medbox to issue false and misleading statements concerning the information described herein.   Because of their advisory, executive, managerial, and directorial positions with Medbox, each of Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

74.    Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Medbox shareholders.

75.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.   For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the board to initiate this action because making a demand would be a futile and useless act.

76.    Any suit by the Board to remedy these wrongs would likely expose certain Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Defendants; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

77.     Each of the Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

78.     Each of the Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

79.     Additionally, each of the Defendants received payments, benefits, stock options and other emoluments by virtue of their membership on the Board and their control of Medbox.

**Director Defendants Are Not Independent**

80.     Each Defendant, as a member of the Board, is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action because the foregoing facts, along with the following facts, taken collectively, demonstrate that they each have conflicts of interest and face a substantial likelihood of liability.

**Defendant Marsala**

81.     Defendant Marsala is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Marsala (as President and CEO of the Company) is an employee of the Company who derives substantially all of his income from his employment with Medbox, making him not independent. As such, Defendant Marsala cannot independently consider any demand to sue himself for breaching his fiduciary duties to Medbox, because that would expose him to liability and threaten his livelihood.

82. Further, during the third quarter of 2014, Defendant Marsala received 20,000 shares from Defendant Mehdizadeh out of his personal holdings to compensate Defendant Marsala for his performance. On October 24, 2014, the Compensation Committee of the Board recommended that shares be returned to the founder and issued by the Company as part of the yearly RSU grant. In November 2014, Defendant Marsala returned 20,000 shares to Defendant Mehdizadeh and 20,000 additional shares were approved to increase Defendant Marsala's first year RSU grant from 50,000 RSU's to 70,000 RSU's.

83. The Company agreed to pay Defendant Marsala a salary of $330,000 per year and to pay Defendant Marsala $2,500 per month for living expenses in the West Hollywood, California area. Defendant Marsala will also be entitled to an annual bonus of up to $250,000, including up to $125,000 in cash and up to $125,000 in equity of the Company, subject to performance criteria and objectives to be established by mutual agreement of the Board and Defendant Marsala within 90 days of the effective date of the Marsala Employment Agreement, and thereafter from time to time by the Board in consultation with Defendant Marsala. Defendant Marsala will also be entitled to an award of restricted stock units, to be issued within 90 days of the effective date of the Marsala Employment Agreement, under an equity incentive plan to be adopted by the Company, in the amount of the greater (by value) of 50,000 shares of common stock or $500,000 of common stock based on the volume weighted average price for the 30 day period prior to the date of the grant. The Company also agreed to make an equal stock award to Defendant Marsala on each anniversary date of the Employment Agreement.

84. Accordingly, Defendant Marsala lacks independence from Defendants Siegel and Lowe, defendants who are not disinterested and who exert influence over defendantMarsala's compensation by virtue of their positions as representing the entire Compensation Committee.

85. This lack of independence and financial benefits received by Defendant Marsala renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

86. In addition, Defendant Marsala is beholden to Defendant Mehdizadeh as a result of entering into the Agreement (defined below) and entrenching himself in his current position for a year starting from January 21, 2015.

**Defendant Siegel**

87. Defendant Siegel owns 62,075 shares of Company stock, which does not include 42,188 shares that vested on January 1, 2015 and 42,187 shares that will vest on March 31, 2015. Defendant Siegel is beholden to Defendant Mehdizadeh as a result of entering into the Agreement (defined below) and entrenching himself in his current position for a year starting from January 21, 2015.

**Defendant Lowe**

88. Defendant Lowe owns 73,750 shares of Company stock, which does not include 42,188 shares that vested on January 1, 2015 and 42,187 shares that will vest on March 31, 2015. Defendant Lowe is beholden to Defendant Mehdizadeh as a result of entering into the Agreement (defined below) and entrenching himself in his current position for a year starting from January 21, 2015.

**Defendant Love**

89. Defendant Love was granted 19,452 RSU's for 2014. Her contract calls for grants of 100,000 RSU's for each succeeding year of service beginning on April 1, 2015. Defendant Love is beholden to Defendant Mehdizadeh as a result of entering into the Agreement (defined below) and entrenching herself in her current position for a year starting from January 21, 2015.

**Additional Facts That Demonstrate Defendants' Disinterest**

90. In November 2011, Defendant Mehdizadeh became the majority stockholder upon his purchase of 5,421,500 shares of Common Stock representing 50% of the outstanding shares of Common Stock.

91.   In August 2012, Defendant Mehdizadeh purchased the remainder of the outstanding shares of the Company in a private transaction and transferred such shares to a holding company named Vincent Chase, Inc., which is controlled by him.   As the controlling owner of the Company, Defendant Mehdizadeh subsequently replaced the Company's management with current management and the Company's board of directors was expanded by board action to include its present members.

92.   Since that time, however, Defendant Mehdizadeh determined that a further change in the Company's management and Board may be necessary to advance the interests of the Company and its stockholders.

93.   In view of the foregoing, Defendant Mehdizadeh executed a Consent Action on January 9, 2015, to elect successor directors to the entire Board as permitted under Article III, Section 5 of the Bylaws, which provides that, if "the directors then in office who have been elected by the stockholders shall constitute less than a majority of the directors then in office, any holder of an aggregate of five percent or more of the total number of shares at the time outstanding having the right to vote for such directors may call a special meeting of the stockholders to elect the entire board."  Further, Section 5 also provides that, "the term of office of any director not elected by the stockholders shall terminate upon the election of a successor."

94.   Moreover, as permitted by NRS Section 78.320, Article II, Section 10 of the Bylaws provides that any action which may be taken at any annual or special meeting of stockholders (such as electing successor directors), may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, is signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

95.     At the present time, the directors of the Company constitute less than a majority of the directors in office.    As such, under Article III, Section 5 of the Bylaws, Defendant Mehdizadeh has the right to elect the entire Board at a special meeting of the stockholders, and under Article II, Section 10 of the Bylaws, this stockholder action may be taken by a written consent signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting.

96.     The Consent Action represents stockholder action of more than the minimum number of votes that would be necessary to authorize or to take the action at a stockholder meeting to elect four (4) successor directors as the entire Board of the Company.  After the Effective Date, the Board and Defendant Mehdizadeh may determine to enlarge the size of the Board and add additional directors, including persons who may have formerly served as directors or officers of the Company.

97.     On January 16, 2015, the current Board caused the Company to file a complaint in Los Angeles Superior Court disputing the legal effectiveness of the Written Consent (the "State Complaint").

98.     On January 21, 2015, the Company, Defendant Mehdizadeh, PVM International, Inc., ("PVM"), and Vincent Chase, Incorporated, ("VC") (both entities controlled by Defendant Mehdizadeh) (collectively, "VM Parties") entered into an agreement pursuant to which (a) the VM Parties acknowledged that the Written Consent was cancelled and withdrawn; (b) the parties agreed to enter into a Voting Agreement to vote in favor of and to not remove directors Siegel, Lowe, Love and Marsala for a period of 12 months (the "Voting Agreement"); (3) the Board would cause the Company to dismiss the State Complaint with prejudice; (4) the Board would meet with Defendant Mehdizadeh on specified dates during the term of the agreement to discuss and to hear matters of interest or concern of Defendant Mehdizadeh, as a stockholder of the Company (the "Agreement").  Each of the directors of the Company are also parties to the Voting Agreement.

99.     Pursuant to the terms of the Agreement, the VM Parties may on or before January 25, 2015, present a term sheet to the Company from an accredited investor to invest in not less than $1,000,000 in restricted common stock of the Company on terms as reasonably agreed to by the Board (the "Private Placement"). In addition, either as part of the closing of the Private Placement or otherwise at the request of Defendant Mehdizadeh, Defendant Mehdizadeh shall have the right to appoint a person nominated by him with industry experience and reasonably acceptable to the Board as the fifth director of the Company.

100.     Plaintiff alleges that the Voting Agreement was entered into in order for the present Board to keep themselves entrenched in their current position.

## FIRST CAUSE OF ACTION

### Against Defendants For Breach of Fiduciary Duty

101.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

102.     Defendants owed and owe Medbox fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Medbox the highest obligation of good faith, fair dealing, loyalty and due care.

103.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

104.     Each of Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company and failed to correct the Company's publicly reported financial guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Medbox has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

106.     Plaintiff, on behalf of Medbox, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against Defendants For Gross Mismanagement

107.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

108.   By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Medbox in a manner consistent with the operations of a publicly held corporation.

109.   As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Medbox has sustained significant financial and reputational damage.

110.   As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

111.   Plaintiff, on behalf of Medbox, has no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment as follows:

A.    Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary and gross mismanagement;

B.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

C.    Granting such other and further relief as the Court deems just and proper.

///

///

///

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 10, 2015

**MATTHEW L. SHARP, LTD.**

By:    /s/ Matthew L. Sharp__
Matthew L. Sharp
Nevada Bar No. 4746
432 Ridge St
Reno, NV 89501
Phone: (775) 324-1500
Fax: (775) 284-0675
Matt@MattSharpLaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:   (212) 983-1300
Fax:   (212) 983-0383
tjmckenna@gme-law.com
gegleston@gme-law.com

*Attorneys for Plaintiff*

VERIFICATION

I, Robert J. Calabrese, declare that I have reviewed the Verified Shareholder

Derivative Complaint ("Complaint") prepared on behalf of Medbox, Inc. and authorize its filing.

I have reviewed the allegations made in the Complaint, and to those allegations of which I have

personal knowledge, I believe those allegations to be true.  As to those allegations of which I do

not have personal knowledge, I rely on my counsel and their investigation and for that reason

believe them to be true.  I further declare that I am a current holder, and have been a holder, of

Medbox, Inc. common stock at all relevant times.

Date: February _28_, 2015

ROBERT J. CALABRESE