1   Matthew L. Sharp
    MATTHEW L. SHARP, LTD.
2   Nevada Bar No. 4746
    432 Ridge Street
3   Reno, Nevada 89501
    Telephone:    (775) 324-1500
4
5   Robert I. Harwood
    Matthew M. Houston
6   Benjamin I. Sachs-Michaels
    HARWOOD FEFFER LLP
7   488 Madison Avenue
    New York, NY 10022
8   Telephone:    (212) 935-7400
9
    Thomas J. McKenna
10  GAINEY McKENNA & EGLESTON
    440 Park Avenue South, 5th Floor
11  New York, NY 10016
    Telephone:    (212) 983-1300
12
13  *Attorneys for Plaintiffs*

14              UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
15

16  _____        Base File No. 3:15-cv-00147-LRH-WGC

17  IN RE MEDBOX, INC. DERIVATIVE           **VERIFIED CONSOLIDATED**
    LITIGATION                              **SHAREHOLDER DERIVATIVE**
18                                          **COMPLAINT FOR BREACH OF**
                                            **FIDUCIARY DUTY AND ABUSE OF**
19  ------------------------------------    **CONTROL**
    This document relates to: ALL ACTIONS
20  ------------------------------------    **DEMAND FOR JURY TRIAL**

21

22

23          Plaintiffs Robert J. Calabrese ("Calabrese"), Tyler Gray ("Gray") and Giuseppe Modica

24  ("Modica"), by and through their undersigned attorneys, bring this consolidated derivative

25  complaint (the "Complaint") for the benefit of nominal defendant, Medbox, Inc. ("Medbox" or the

26  "Company"), against certain members of its Board of Directors (the "Board") and certain of its

27  executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

28
    _____
    CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
    ABUSE OF CONTROL

**NATURE AND SUMMARY OF THE ACTION**

1.     Medbox provides software and consulting services to medical marijuana dispensaries and sells a patented vending machine designed to dispense medical marijuana.  The Company was founded in 2010 by defendant Pejman Vincent Mehdizadeh ("Mehdizadeh").  From the founding of Medbox until March 2015, defendant Mehdizadeh was the majority shareholder of Medbox and controlled the business activities of Medbox.

2.     Completely disregarding his fiduciary responsibilities as a majority shareholder, officer, and director of a publicly traded company, defendant Mehdizadeh has used and abused Medbox as if it were his private play toy and failed to operate the business pursuant to the requirements of a publicly traded Company.  In his own words, Mehdizadeh "was involved in almost every decision the company made."

3.     These decisions comprise a series of unacceptable behavior for a corporate fiduciary.  For example, in 2012 Mehdizadeh decided to compensate himself over $410,706 at a time when his only role was as a "consultant."  At the same time, the Company's *net income* for 2012 was only $327,853 and the Company's Chief Executive Officer ("CEO") was earning only $65,000, or approximately one-seventh of the compensation earned by consultant Mehdizadeh.

4.     Defendant Mehdizadeh's decisions also include acts that bespeak of moral turpitude and a desire to deceive investors, such as: (a) hiring an "independent" auditor that has been censured by the Public Accounting Oversight Board and is currently the subject, along with the Company, of a U.S. Department of Justice ("DOJ") grand jury investigation; (b) attempting to conceal from investors that he is a convicted felon due to actions he and his father took pretending to be attorneys and stealing over $450,000 from people in need; (c) publicly denying that the Company was under investigation by the SEC when in fact the Company *was and is* under investigation by the SEC; and (d) issuing false and misleading press releases without authorization under the Medbox name and logo at a time when he was neither an officer nor a director of the Company.

5.     Due to defendant Mehdizadeh's direct and personal involvement in Medbox, he knew that since at least the beginning of 2013 the Company's financial statements were

inaccurate.  These inaccuracies were so pervasive that they include, for example: (a) the issuance of press releases in 2013 claiming the Company had "booked" $2 million in revenue in the first quarter of 2013 when it had not; (b) the issuance of at least two sets of distinct financial statements reporting different results for the third quarter of 2013; and (c) the December 30, 2014 announcement that Medbox would be forced to restate its financial statements for at least the full year of 2013 and the first three quarters of 2014 due to material errors, and potentially financial statements from 2012 as well.

6.     Compliant in these fiduciary breaches were the directors charged with leading the Company.  Between 2013 and commencement of this action, there were four distinct iterations of Medbox's Board of Directors.  Defendant Mehdizadeh used his position as a majority shareholder to appoint and terminate directors at will and has completely dominated Medbox's Board and the corporation for his own benefit.  This tactic has resulted in a rarely-seen level of Board turnover summarized as follows:

| Board 1 (2013 – April 2014)[1] | Board 2 (April 2014 – August 2014) | Board 3 (August 2014 – October 2014) | Demand Board[2] (October 2014 – July 2015) |
|---|---|---|---|
| Mehdizadeh | | | |
| Bedrick[3] | Bedrick | | |
| | Feinstein | Feinstein | |
| | Lowe | Lowe | Lowe |
| | Siegel | Siegel | Siegel |
| | | Marsala | Marsala |
| | | | Love |

7.     Although the aforementioned breaches of fiduciary duties are sufficient to state a claim without more, the following recent events specifically precipitated the filing of these consolidated actions.  The Company disclosed on October 31, 2014 that: (a) a federal grand jury was investigating matters pertaining to Medbox and had issued a subpoena to the Company's public accountant; and (b) a whistleblower had contacted the U.S. Securities and Exchange

---

[1]     Dates are approximate since not all directors of a particular Board were appointed on the same day.

[2]     For the purposes of demand futility, the relevant Board is the Demand Board.

[3]     Defendants Bedrick, Feinstein, Lowe, Siegel, Marsala, and Love are defined herein.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

Commission (the "SEC") alleging that defendant Mehdizadeh had engaged in insider trading and securities fraud.  Incredibly, the majority of the Demand Board knew about the grand jury investigation since August 2014, but concealed its existence from shareholders and took no action for three months.  Instead, these defendants used the three months from August to October 2014 to sell hundreds of thousands of dollars of Medbox stock.

8.      Beginning on November 3, 2014, defendant Mehdizadeh issued a series of press releases denying that the Company was under investigation by the SEC.  This forced the Company to file a Form 8-K on November 7, 2014 stating that Mehdizadeh's November 3 press release was unauthorized and directing investors to rely on the original October 31, 2014 disclosure regarding the SEC whistleblower and grand jury investigation.  On November 12, 2014, the Company filed a Form 10-Q with the SEC which, among other things, confirmed that the SEC "is conducting an investigation pertaining to the Company and issued a subpoena."  Defendant Mehdizadeh's commitment to concealing the truth about Medbox and his activities did not stop at issuing false press releases, however.

9.      On December 22, 2014, apparently worried his wrongdoing was about to be exposed, defendant Mehdizadeh issued a press release defending the Company's revenue recognition and downplaying it as a "difference of opinion."  As described herein, the Company subsequently acknowledged that this press release was false and/or misleading.

10.      On March 9, 2015, the Company disclosed that it had completed its financial review and stated that it planned to file amended and restated Forms: (a) 10-K containing financial statements for the years 2012 and 2013; and (b) 10-Q for the first, second, and third quarters of 2014.  As a result of the misleading accounting, Medbox overstated its revenue by over $1.3 million during 2012, and by $3 million during 2013.  In both cases the overstatement was greater than the Company's total restated revenue during those periods.

11.      Demonstrating a stunning lack of corporate governance, defendants failed to meet even the rudimentary requirement to have an independent Audit Committee.  From the beginning of 2013 until August 2014, upon information and belief, Medbox's Board never had an Audit Committee.  The Board never disclosed the existence of an Audit Committee, its membership, or

an Audit Committee charter.  When the Company finally publicly disclosed an Audit Committee charter adopted in August 2014 on its website, the charter required the Committee be comprised of three independent directors.  As of August 2014, Medbox had never – during its entire corporate history – had three outside directors, let alone three legitimately independent ones, on the Board at once.  Nor did it in August 2014.  Finally, in October 2014, three outside directors were on the Board at once, making it possible for the first time to convene an Audit Committee.  However, the Company *still* does not have a properly comprised, functioning Audit Committee.  Even now, the Audit Committee of Medbox's Board only has two members in contravention of its own charter.

12.  During the saga of wrongdoing detailed herein, Medbox's stock price collapsed from approximately $19.00 per share in June 2014 to the current trading price of $0.06 per share. This decline represents a loss of well over $600 million in market capitalization.

13.  Plaintiffs made no pre-suit demand on the Board because any such demand would have been a futile and useless act.  The Demand Board of Medbox is comprised of defendants Siegel, Lowe, Marsala, and Love.  These defendants have admitted in court filings that defendant Mehdizadeh has committed a wide range of wrongdoing at Medbox and that the Company suffers from pervasive corporate governance deficiencies.  A majority of the Demand Board, defendants Siegel, Lowe, and Marsala, were on Medbox's Board in August 2014 when they were alerted to the grand jury investigation and SEC whistleblower but they declined to take any action or disclose same for approximately three months while they sold hundreds of thousands of dollars in Medbox stock at inflated prices.  The Demand Board has not sued defendant Mehdizadeh to recover the funds that he has stolen or wasted from Company's coffers, nor has the Demand Board enacted the necessary corporate governance enhancements to ensure Medbox is run like a legitimate enterprise.

14.  Each of defendants has breached his or her fiduciary duties in connection with the allegations herein and the Company has been seriously harmed by these breaches of fiduciary duties.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Plaintiff Calabrese is a citizen of New Jersey and plaintiff Gray is a citizen of Illinois.  No defendant is a citizen of either Illinois or New Jersey.  This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

16.     Venue is proper in this Court because Medbox maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**A.     Plaintiffs**

17.     Plaintiff Calabrese is a citizen of New Jersey and is, and was at all times relevant hereto, an owner and holder of Medbox common stock.

18.     Plaintiff Gray is a citizen of Illinois and is, and was at all times relevant hereto, an owner and holder of Medbox common stock.

19.     Plaintiff Giuseppe Modica is a citizen of Italy and is, and was at all times relevant hereto, an owner and holder of Medbox common stock.

**B.     Defendants**

The Company

20.     Nominal defendant Medbox is a corporation incorporated under the laws of the State of Nevada, which maintains its principal executive offices at 8439 West Sunset Blvd., Suite 101 West Hollywood, California.   Medbox provides consulting, services, and products to marijuana dispensaries.   Medbox's common stock trades over the counter ("OTC") under the symbol "MDBX."

Demand Board Members

21.     Guy Marsala ("Marsala") served as President and CEO, and a director, of Medbox from July 23, 2014 until his resignation on June 30, 2015. Defendant Marsala was a member of

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

Medbox's Board when both of the consolidated actions were filed.  When defendant Marsala resigned, the Company disclosed that he would be entitled to receive $500,000 in severance pay after less than one year of service.  Defendant Marsala was a member of Board 3 and the Demand Board.  Upon information and belief, defendant Marsala is a citizen of California.

22.    J. Mitchell Lowe ("Lowe") has served as a director of Medbox since March 2014. Defendant Lowe was a member of Boards 2 and 3, and the Demand Board.  Defendant Lowe is the Chairperson of the Compensation Committee and a member of the Governance and Nominating Committee.  Upon information and belief, defendant Lowe is a citizen of California.

23.    Ned Siegel ("Siegel") has served as a director of Medbox since April 2014. Defendant Siegel was a member of Boards 2 and 3, and Chairman of the Demand Board.  At relevant times, defendant Siegel was also a member of the Audit Committee, the Compensation Committee, and the Governance and Nominating Committee.  Upon information and belief, defendant Siegel is a citizen of Florida.

24.    Jennifer S. Love ("Love") has served as a director of Medbox since October 22, 2014 and was a member of the Demand Board.  Defendant Love is the Chairperson of the Audit Committee.  Upon information and belief, defendant Love is a citizen of Missouri.

Past Directors and Officers

25.    Defendant Mehdizadeh was previously CEO, is the founder of Medbox, and was the majority shareholder of Medbox until March 2015.  Defendant Mehdizadeh served as a senior consultant to the Company from December 2012 until May 2013, when he was appointed as the Company's Chief Operating Officer ("COO") and Chairman of the Board of Directors.  On April 10, 2014, Mehdizadeh resigned as COO and a director and became a "Senior Strategist."  On October 13, 2014, Mehdizadeh resigned as Senior Strategist of the Company but continued to serve as a consultant to the Company.  On January 9, 2015, entities controlled by defendant Mehdizadeh illegally executed a written consent ("Written Consent") installing him once again as Chairman of the Board effective January 29, 2015.  The Written Consent was later withdrawn. Defendant Mehdizadeh was a member of Board 1.  Upon information and belief, defendant Mehdizadeh is a citizen of California.

26.     Bruce Bedrick ("Bedrick") served as the Company's CEO from December 2011 until July 23, 2014.  Defendant Bedrick served as a director of Medbox from December 2011 until August 18, 2014, as a member of Boards 1 and 2.  Although Medbox's public filings routinely referred to defendant Bedrick as a "physician" and stated he possessed medical expertise relevant to the Company's business, in fact defendant Bedrick is a chiropractor, not a physician, and does not hold an M.D.  Upon information and belief, defendant Bedrick is a citizen of Airzona.

27.     Matthew Feinstein ("Feinstein") was to be appointed director effective January 29, 2015 by the Mehdizadeh controlled entities via the illegal and subsequently withdrawn January 9, 2015 Written Consent.  Defendant Feinstein worked as a consultant for Medbox beginning in June 2013 and became a Vice President in February 2014.  Feinstein previously served as a director of the Company from April 2014 until October 2014.  Defendant Feinstein was a member of Boards 2 and 3.  Upon information and belief, defendant Feinstein is a citizen of California.

28.     Thomas Iwanski ("Iwanski") served as the Company's Chief Financial Officer ("CFO") from February 2014 until he resigned on October 16, 2014.  Defendant Iwanski initially joined Medbox in April 2013 as an accounting consultant.  Upon information and belief, defendant Iwanski is a citizen of California.

29.     C. Douglas Mitchell ("Mitchell") became Medbox's CFO on October 21, 2014 and continues to serve in that role.  Upon information and belief, defendant Mitchell is a citizen of California.

## DEFENDANTS' DUTIES

30.     By reason of their positions as officers, directors, and/or fiduciaries of Medbox and because of their ability to control the business and corporate affairs of Medbox, defendants owed Medbox and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Medbox in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Medbox and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Medbox and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

1  affairs of the Company and in the use and preservation of its property and assets, and the highest

2  obligations of fair dealing.

3      31.    Defendants, because of their positions of control and authority as directors and/or

4  officers of Medbox, were able to and did, directly and/or indirectly, exercise control over the

5  wrongful acts complained of herein, as well as the contents of the various public statements issued

6  by the Company.  Because of their advisory, executive, managerial, and directorial positions with

7  Medbox, each of the defendants had knowledge of material non-public information regarding the

8  Company.

9      32.    To discharge their duties, the officers and directors of Medbox were required to

10  exercise reasonable and prudent supervision over the management, policies, practices and controls

11  of the Company.  By virtue of such duties, the officers and directors of Medbox were required to,

12  among other things:

13      a.    Exercise good faith to ensure that the affairs of the Company were conducted in an

14          efficient, business-like manner so as to make it possible to provide the highest

15          quality performance of their business;

16      b.    Exercise good faith to ensure that the Company was operated in a diligent, honest

17          and prudent manner and complied with all applicable federal and state laws, rules,

18          regulations and requirements, and all contractual obligations, including acting only

19          within the scope of its legal authority;

20      c.    Exercise good faith to ensure that the Company's communications with the

21          public and with shareholders are made with due candor in a timely and

22          complete fashion; and

23      d.    When put on notice of problems with the Company's business practices and

24          operations, exercise good faith in taking appropriate action to correct the

25          misconduct and prevent its recurrence.

26      33.    Defendants Siegel and Lowe, as members of the Corporate Governance and

27  Nominating Committee, were bound by that committee's charter which states that their duties

28  included: (a) identifying the qualifications and skills which should be present in the Board "and

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
ABUSE OF CONTROL

9

identify gaps between the current and desired skill set, qualifications and other criteria"; (b) formulate and recommend a policy regarding the qualifications, skills and other attributes the Company seeks in nominees for election to the Board; (c) recommend appointments to committees of the Board and chairpersons for such committees; (d) review of appropriateness of Board committees and the need for additional committees: (e) review the size and composition of the Board and recommend any changes it deems advisable; (f) annually review the status of each member of the Board as independent or not independent and submit a report on the subject to the Board; (g) advise the Board regarding the appropriate board leadership structure for the Company; (h) review and assess corporate governance policies for the Company, including the Company's Code of Ethics and recommend any proposed changes to the Board for approval; and (i) be available to the Board and members of the Company's senior management team to consult with and to resolve reported violations or instances of non-compliance with the Company's Code of Ethics.

34.    Defendants Siegel and Love, as members of the Audit Committee, were bound by that committee's charter which states that the committee must be comprised of three independent directors and that their duties included, among other things: (a) review on a continuing basis the adequacy of the Company's financial reporting; (b) review any significant disagreement among management and the independent auditors regarding the Company's financial statements; (c) review of the adequacy of the Company's disclosure controls and procedures; and (d) review the extent to which improvements to the Company's internal controls have been implemented.

35.    Defendants Siegel and Lowe, as members of the Compensation Committee, were bound by that committee's charter which states that their duties included, among other things: (a) review of the Company's compensation policies; (b) annually review and evaluate the CEO's performance relative to corporate goals; (c) administer and implement the Company's incentive compensation plan; (d) establish performance objections; (e) imposing limitations, restrictions, and conditions upon any grant or award; and (f) advise on the setting of compensation for officers.

# BACKGROUND

## Medbox Corporate History

36.     Medbox, through its subsidiaries, provides storage and dispensing systems to the medical and retail industries, upon information and belief, exclusively related to medical marijuana.   The Company offers Medbox, a marijuana dispensing machine that dispenses marijuana-derived medications to individuals based on biometric identification.  Its products also include Safe Access Storage Lockers; Medbox medicine storage machines; and Lockbox Rx, a storage/retrieval system that is used for prescription medication, over-the-counter medicines, and other pharmacy products. In addition, the Company provides Sample-Safe, a wall-mounted unit for use in doctors' offices; sells the point-of-sale system that includes a monitor, keyboard, credit card reader, and computer with interface; and offers Medbox OTC machines, a non-biometric machine for over-the-counter items, and various vaporizer and accessory products, such as miVape.

37.     The predecessor entity to Medbox was incorporated in Nevada as Rabatco, Inc. While it was originally described as a mining company, Robatco was inactive from 1982 to 1998, and re-emerged in 1998 as a company seeking to "acquire computer related technology."

38.     In 2000, the Company's name was changed to MindfulEye, Inc. ("MindfulEye"). MindfulEye's business was operating self-serve kiosks where consumers could download movies onto a flash drive.  According to a MindfulEye filing on the OTC website, the movies sold at the Company's kiosks were "adult" films.

39.     MindfulEye never reported a profitable fiscal year, and by July 2004 it had terminated its duty to file reports and schedules with the SEC.  It continued to be traded as a public company on OTC Markets, but its corporate charter lapsed. On June 21, 2005, an attorney named Peter E. Berney ("Berney") reinstated the corporate charter and took control of the company.  According to posts online, Berney, although an attorney, has a criminal record of securities fraud, became widely known for "box jobs," in which he "would create fraudulent companies, often by hijacking dormant shells, and install nominee officers who would put much

1  of the companies' stock into the hands of promoters. Once the stage was set, a pump and dump

2  operation would follow."

3      40.    Berney sold the MindfulEye shell corporation to a middleman, who then sold it in

4  2010 to Shannon Illingworth, who is the CEO of AVT, Inc., the company that makes Medbox's

5  marijuana vending machines.  MindfulEye's revenues for 2010 were $0 and its cash on hand on

6  March 31, 2011 was $23,689.  Even though they had almost no value, shares of MindfulEye

7  continued to be tradable over the counter.

8      41.    On August 30, 2011, in contemplation of defendant Mehdizadeh's acquisition of

9  the Company, MindfulEye's name was changed to Medbox.  On November 25, 2011, defendant

10 Mehdizadeh purchased 50% of the outstanding common stock of the Company, immediately after

11 his tax debts had been discharged in bankruptcy.  Thereafter, defendant Mehdizadeh, through

12 PVMI, Inc. ("PVMI"), an entity he wholly owned, acquired all of the outstanding shares of the

13 Company during 2012 in exchange for 10 million shares of common and 3 million shares of

14 preferred stock in the new company.

15     42.    Defendant Mehdizadeh brought in defendant Bedrick to run Medbox as CEO.

16 According to an article entitled "A Convicted Thief And A Chiropractor Claim Their Pot

17 Company Isn't A One-Hit Wonder," published by the Phoenix New Times, Defendant Bedrick,

18 was arrested in New Mexico and was indicted in 1992 by the federal government for possession of

19 marijuana with intent to sell.   Defendant Bedrick ultimately avoided prosecution and the

20 indictment was dismissed following a court's ruling suppressing the evidence as illegally obtained.

21 Like Mehdizadeh, defendant Bedrick has also had issues with the IRS, with a federal tax lien

22 being filed against him in 2008 for approximately $88,000 in unpaid taxes from 2002 and 2004 .

23                          **SUBSTANTIVE ALLEGATIONS**

24     43.    On April 2, 2013, the Company issued a press release titled "Medbox Completes

25 Financial Audit," which states in part:

26     HOLLYWOOD, Calif., April 2, 2013 /PRNewswire/ -- Medbox, Inc. (OTC
       Markets: MDBX) (www.medboxinc.com), announced it has cleared a financial
27     audit of its prior 2 years of operations. Q Accountancy Corporation of Irvine,
       California headed up the audit as a public company accountancy and oversight
28

---

board (PCAOB) certified firm that specializes in complex audits of this size and scope.

\* \* \*

Medbox reports that all $673,000 in deferred revenue was paid in Q1 2013 and as a result added to that quarter's revenue figures *making Q1 2013 revenue well in excess of $2 million* - a company record.

\* \* \*

"We are absolutely thrilled that we have cleared this proverbial hurdle in our company's history," stated Dr. Bruce Bedrick, CEO of Medbox, Inc.   "We anticipate filing our Form 10 by Friday and 60 days thereafter the filing shall be deemed effective. We want to thank all of our supporters that helped us in becoming a viable public company."

(Emphasis added.)

44.     Unfortunately for Medbox and its shareholders, although the engagement of a public accounting firm should have led to more accurate financial reporting and transparency, this was not to be.  When defendant Mehdizadeh, who at the time was Medbox's "Senior Consultant and Founder" and defendant Bedrick, then Medbox's CEO, decided to engage Q Accountancy Corporation ("Q Accountancy") they did so knowing that the accountant would be no more than a rubber stamp for their financial manipulations and untruthful disclosures.   About six months earlier, on September 27, 2012, the Public Company Accounting Oversight Board had issued a report after an inspection of Q Accountancy.[4]  The report, which is publicly available, provides a grim foreshadowing of the situation at Medbox:

The inspection team identified what it considered to be *audit deficiencies*.  Those deficiencies included *a failure by the Firm to identify or appropriately address an error in the issuer's application of GAAP that appeared likely to be material* to the issuer's financial statements.  In addition, the deficiencies included *failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures*.

\* \* \*

---

[4]     Also in 2012, the SEC sued the founder of Q Accountancy, Tim Quintanilla ("Quintanilla"), for issuing misleading audits based on "reckless and deficient work."  In 2013, Quintanilla was named as a defendants in a federal securities fraud class action.  Both the SEC action and the securities fraud action remain pending.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

13

> The deficiencies identified in both audits reviewed included deficiencies of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential matter to support its opinion on the issuer's financial statements.

* * *

> On the basis of the information reported by the inspection team, including the audit performance deficiencies [described previously in the report], *the Board has concerns that the Firm's system of quality controls fails to provide such reasonable assurance in at least the following respects….* The Firm's system of quality control appears not to provide sufficient assurance that the Firm will conduct all testing appropriate to a particular audit.

(Emphasis added.)

45.   A press release issued by Medbox the next day, on April 3, 2013, tacitly acknowledged that Q Accountancy was not the quality independent auditor that the Company and its shareholders needed.  The release states in part:

> While Q Accountancy Corporation's audit delivered an acceptable set of financial statements, management believes a firm more focused and supportive of emerging microcap public companies would be best suited for long term operations. *Management believes it is in the best interest of the shareholders and the company, as a whole, to make this change, although it will delay the filing of its Form 10* to the latter part of April.

> "The point is getting the job done with the right people. We have identified a firm and we look forward to announcing their engagement shortly," stated Dr. Bruce Bedrick, CEO of Medbox, Inc.  "Corporate governance is paramount and the company will do what is needed for the Form 10 to be viewed as favorably as possible by the SEC."

(Emphasis added.)

46.   However, the promise to find a better qualified independent auditor, like many of the promises made by defendants Mehdizadeh and Bedrick did not come to pass in time to avoid serious harm to Medbox.  Q Accountancy was only replaced in February 2015.

47.   On April 10, 2013, the Company filed its first Form 10 with the SEC.  The Form 10 contains financial statements for the full years ended December 31, 2012 and 2011, audited by Q Accountancy.  The Form 10 discloses that Medbox had eight full time employees, five part time

---

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

employees, and used six independent contractors.  The Form 10 contains the following disclosure about defendant Mehdizadeh:

> Prior to founding MDS, Mr. Mehdizadeh was the Director of Client Relations for the following law offices at various times from 2003 through 2008:  Law Office of Donald J. Townley; Law Offices of Frank E. Miller; Law Offices of Thomas R. Lee, Rexford Law Group; and the Moheban Law Firm.

> In 2007, Mr. Mehdizadeh was involved in the sale of his automobile to a private party. The transaction terms were in dispute by the parties and Mr. Mehdizadeh pled no-contest to using an access card (credit card) without the owner's consent. The matter was resolved with Mr. Mehdizadeh receiving probation. Mehdizadeh is still currently on probation for that offense.

48.     On April 15, 2013, the Company issued a press release titled "Medbox Positions Itself as the Leader on Wall Street in the Legalized Marijuana Industry," which repeats that the Company had achieved $2 million in quarterly revenue: "Medbox is proud to report that Q1 2013 was its highest revenue quarter in the company's history *at more than $2 million booked* as revenue and over $1.5 million booked as deferred revenue." (Emphasis added.)

49.     On May 21, 2013, the Company filed its quarterly report for the period ended March 31, 2013 with OTCmarkets.com and disclosed that in fact, its disclosures during April 2013 were untrue: it had not "booked" "more than $2 million" in revenues and ultimately reported revenue for the quarter of $1,749,554.[5]

50.     On June 4, 2013, the Company filed a letter with the SEC requesting withdrawal of its Form 10 filed in April 2013 because Medbox would "not have time to complete certain financial statement updates."

51.     On June 21, 2013, the Los Angeles County District Attorney's Office issued a press release titled "Father, Son Plead to Criminal Charges in $450,000 Unauthorized Practice of Law Case."  The press release states in part:

---

[5]     Another balance sheet attached to the Company's 2012 Annual Report and apparently audited by Q Accountancy in January 2014 lists the Company's revenues for the quarter ended March 31, 2013 as only $1,245,522. *See* https://www.otciq.com/otciq/ajax/showFinancialReportById.pdf?id=115813.

A father and son accused of stealing $450,000 from more than a dozen victims by offering unlicensed legal services pleaded no contest today, the Los Angeles County District Attorney's Office announced.

Pejman [Vincent] Mehdizadeh, 35, of Los Angeles, told victims he was a licensed attorney or that he worked with one and that he could provide a variety of services – including obtaining green cards, loan modifications and divorces. His father, Parvis Mehdizadeh, 78, of Calabasas, assisted. Between 2002 and 2009, they took payments from 15 victims ranging from $2,000 to $200,000.

\* \* \*

The younger Mehdizadeh pleaded no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000. Los Angeles County Superior Court Judge Robert J. Perry immediately sentenced him to four years in state prison, suspended, and five years of formal probation.

Under the terms of a negotiated plea agreement, the son was ordered to pay back $450,000 in restitution on or by Oct. 21 or face prison time. To date, he has paid $370,000 in restitution.

52.     On July 17, 2013, the Company filed with the SEC a prospectus on Form S-1 for an initial public offering of 3 million shares of Medbox common stock at $25 per share.  Among other things, the Form S-1 states "[w]e recognize revenue in accordance with ASC 605, *Revenue Recognition*."  (Emphasis in original).   The Form S-1 states Medbox only recognizes revenue when all of the following have occurred: (a) persuasive evidence of an arrangement exists; (b) the products and services have been provided to the customer; (c) the fee is fixed or determinable; and (d) collectability is reasonably assured.  Defendants Bedrick and Mehdizadeh were now listed as CEO and a director, and COO and Chairman of the Board, respectively.  Defendant Mehdizadeh's salary as COO was disclosed as $180,000 per year and defendant Bedrick's as CEO was $65,000.  The Form S-1 states defendant Iwanski would become Medbox's CFO on September 1, 2013.  As with the previously filed Form 10, the Form S-1's disclosures regarding defendant Mehdizadeh characterize his employment history as "Director of Client Relations" at various small law firms and mentioned the 2007 dispute involving the sale of an automobile, but critically makes no mention of defendant Mehdizadeh's recent felony conviction.

53.     On September 30, 2013, the Southern Investigative Reporting Foundation ("SIRF") published an article about defendant Mehdizadeh titled "Tinkerer, Lawyer, Hustler, Lies: One Man's Path to a Dope Fortune."  The article describes Mehdizadeh's past pattern of dishonesty:

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

16

In the spring of 2010, exasperated police detectives from all over Los Angeles began phoning the county's consumer affairs department to complain that an outfit calling itself the Active Lawyers Referral Service had misled its working-class customers from 2005 to 2008 by referring them to a law firm that billed them for work—but never finished the job. Their tales got positively woolly: Several claimed that Pejman Vincent Mehdizadeh, the founder of the referral service and the manager of the law firm, had posed as a lawyer and his father, Parviz, had given them legal advice as they sought work visas. (Pejman and Parviz use the names Vincent and Paul, respectively, for business.)

Three years later the consumer affairs unit, along with the Los Angeles County district attorney's office, sought to prosecute Vincent Mehdizadeh, who, after months of wrangling, pleaded no contest to various criminal charges. He consented to pay $450,000 in restitution to his victims, thereby avoiding a four year sentence in a California state penitentiary. (His father, Parviz, pleaded no contest to one misdemeanor charge.)

\* \* \*

A search of Los Angeles area criminal records databases shows that from 1997 to 2007, Mehdizadeh was arrested or pleaded no contest for breaking and entering, solicitation, trespassing and credit card fraud. He declared bankruptcy in July 2010, after landing up to his neck in back taxes owed to the Internal Revenue Service. Earlier this year, he wound up in the middle of the aforementioned consumer affairs investigation.

\* \* \*

One area where there is little room for debate is Mehdizadeh's penchant for posing as a lawyer. After the raid on his marijuana dispensary he wrote in a signed December 2007 post on Weedtracker.com, a dormant pro-marijuana legalization website, "I have a law degree and made managing partner in my firm before the age of 26."

Moreover, in a testimonial for a Web marketing company, Mehdizadeh signed his name "Vincent Mehdizadeh, J.D." Short for juris doctor, J.D. signals an accredited law school awarded a degree.

54.     The SIRF article also describes a number of the accounting problems Medbox had already experienced in September 2013:

For its audits and filing preparation, Medbox turned to Irvine, Calif. based Q Accountancy. But Q Accountancy had a problematic history of its own with regulators and a legacy of troubled clients. In 2012, a congressionally appointed industry watchdog group—the Public Company Accounting Oversight Board— uncovered a sweeping array of deficiencies in Q Accountancy's auditing practices. And last November the SEC sued Q's founder, Timothy Quintanilla, for issuing misleading audits based on "reckless and deficient work."

\* \* \*

How does a company that's trying to smarten its profile before selling more stock get into these jams? One way is to have no one in charge of financial oversight on a fulltime basis. Until Sept. 1, the company's finance chief, Leila Guieb, was

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

moonlighting part-time at Medbox while she worked as an employee at Toyota Financial Services.

\* \* \*

On March 8, a Medbox press release announced a $6 million equity cash infusion, with $1 million already paid and $5 million to arrive in May. Yet, there's no sign of any of this in the company's SEC filings.

In April, Medbox filed a Form 10 as part of its effort to register its shares; the only reference to stock sales was this line in a footnote at the very end: "During January 2013, the Company received a total of $71,520 as payment for the sale of 16,000 shares of common stock during that period."

The S1 filed in July offered no clues about the whereabouts of the promised millions.

(Citations omitted.)

55.    On November 13, 2013, the Company filed an amended Form S-1 with the SEC listing defendant Mehdizadeh's position as "Chief Operating Officer and Chairman of the Board, acting principal financial officer." The amended Form S-1 for the first time discloses that although defendant Mehdizadeh's salary was $180,000, his total compensation for 2012 was $410,706. By contrast Medbox's net income for the full year 2012 was $327,853. The next highest paid officer was defendant Bedrick, the Company's CEO, whose total compensation was $65,000, or approximately 14% of the amount conferred on the Company's former "Senior Consultant" and current "Chief Operating Officer and Chairman of the Board, acting principal financial officer." Defendant Iwanski was now "expect[ed]" to become the Company's CFO "in January 2014." The amended Form S-1 also expands – slightly – on Mehdizadeh's criminal history:

During 2005-2008, Mr. Mehdizadeh was the non-attorney manager for a law firm. In 2008 the supervising attorney whom clients had retained to handle their legal matters retired and left clients without representation. The department of consumer affairs of Los Angeles investigated the matter and decided to recommend prosecution against Mr. Mehdizadeh and not Mr. Mehdizadeh's attorney employer. After a 15 count criminal complaint was filed in 2010, in order to avoid a trial and ongoing bad publicity, Mr. Mehdizadeh pled no-contest to two counts related to theft since money was accepted by the attorney and work had not been completed due to the attorney retiring. Mr. Mehdizadeh accepted the terms of the plea that called for probation and that once Mehdizadeh's probation is complete, it was pre-negotiated that the record of the incident be deleted. *Mr. Mehdizadeh maintains his innocence and believes he was unfairly targeted.*

(Emphasis added.)

56.     On November 19, 2013, defendants Mehdizadeh and Bedrick published Medbox's third quarter 2013 quarterly report on OTCmarkets.com, a document which was not filed with the SEC.   The quarterly report states that: (a) as of September 30, 2013, the Company had total current assets of $3,276,992 and as of December 31, 2012, total current assets of $3,456,802; and (b) the Company's total assets were $6,464,170 and $3,512,670, for the third quarter of 2013 and full year 2012, respectively.   The report disclosed the following results of operations: (a) revenues for the third quarter of $2,079,454; (b) revenues for the nine months ended September 30, 2013 of $5,046,634; (c) net income for the quarter of $258,945; and (d) net income for the nine months ended September 30, 2013 of $388,284.   The November 19, 2013 quarterly report also refers to the Company's 2012 full year results as "restated" without any explanation.

57.     On November 20, 2013, defendants Mehdizadeh and Bedrick caused the Company to issue a press release in connection with the foregoing third quarter results.   The press release states part:

> Gross profit margin for the quarter was a healthy $833 thousand and EBITDA margin for the quarter was approximately 21%.
>
> Income from operations through 3 quarters, before taxes, was a healthy $647 thousand.
>
> "*We have had another record breaking quarter, which provides further validation that our business plan is solid and our operating strategy is sound,*" stated Dr. Bruce Bedrick, CEO of Medbox, Inc. "As we move forward, we will continue to seek out opportunities that provide growth for our company and added value for our shareholders."
>
> The company also announced that they have brought accounting functions in-house to help expedite preparation of statements and reports.
>
> "As we continue to mature and transition to being a fully reporting company, we need to be able to provide timely reports, status updates, and filings," Bedrick commented. "We have assembled an in-house team of accounting professionals.  This team can devote more time to work seamlessly with our outside auditing firm so that we meet our deadlines and obligations, and provide the most

accurate and timely information to the SEC and the general public."

(Emphasis added).

58.     On November 25, 2013, defendants Mehdizadeh and Bedrick caused the Company to issue a press release entitled *Medbox Issues Status Update to Company Shareholders*, which stated that "Medbox posted record revenue figures for YTD 2013, amassing more than $5 million in consulting and equipment sales revenue through 9 months."

59.     On December 19, 2013 the Company filed a letter with the SEC requesting the withdrawal of the July 17, 2013 registration statement, this time because the Company "no longer intends to raise capital by selling stock in a public offering in the immediate future."

60.     In January 2014, the Financial Industry Regulatory Authority ("FINRA") disseminated an advisory regarding risks related to investing in marijuana-related stocks. The FINRA advisory stated:

> Like many investment scams, pitches to invest in potentially fraudulent marijuana-related companies may arrive in a variety of ways — faxes, email or text message invitations to webinars, infomercials, tweets or blog posts. Regardless of how you first hear about them, the offers almost always contain hallmarks of "pump and dump" ploys. Specifically, fraudsters lure investors with aggressive, optimistic — and potentially false and misleading — statements or information designed to create unwarranted demand for shares of a small, thinly traded company with little or no history of financial success (the pump). Once share prices and volumes reach a peak, the cons behind the scam sell off their shares at a profit, leaving investors with worthless stock (the dump).

61.     On January 13, 2014, to soften the effects of the FINRA advisory concerning the risks related to investing in marijuana-related stocks, defendants Mehdizadeh and Bedrick caused the Company to issue a press release entitled *Medbox Comments on FINRA Advisory Concerning Marijuana Stocks*, which stated:

> . . . Medbox . . . commented on FINRA's renewed advisory concerning marijuana related stocks. The advisory, released Friday, highlights what investors should be aware of when investing in marijuana related stocks.
>
> The [FINRA] advisory stated, in part:

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

"We are reissuing this alert to warn investors not only about the potential for fraud in this arena, but also to reiterate the risks of investing in thinly traded companies about which little is known . . . . One company, for example, promoted its move into the medical cannabis space by issuing more than 30 press releases during the first half of 2013. These releases publicized rosy financial prospects and the growth potential of the medical marijuana market. The company was also touted on the Internet through the use of sponsored links, investment profiles and spam email, including one promotional piece claiming the stock "could double its price SOON" and another asserting the stock was "poised to light up the charts!" Yet the company's balance sheet showed only losses, and the company stated elsewhere that it was only beginning to formulate a business plan."

Other excerpts from the [FINRA] advisory stated, in part: "For example, the CEO of one thinly traded, yet heavily touted, company that purports to be in the medical marijuana business spent nine years in prison for operating one of the largest drug smuggling operations in U.S. history. The former CEO of a similar company was recently indicted for his role in a multimillion dollar mortgage-based Ponzi scheme."

Medbox executives were pleased that a stern advisory was reissued about the sector's stocks by FINRA and had the following comments:

"Some of the public companies in the marijuana sector are in the business of self-promotion with little or no substance or even an executable business plan," stated Vincent Mehdizadeh, Chief Operations Officer at Medbox, Inc. "Since day 1, our company has made its quarterly reports and financials available to the public, kept shareholders diligently informed about the company and its operating personnel at all times, offered ongoing support to its many clients, completed an audit of its financials, donated substantial amounts to industry advocacy groups that support medical marijuana patient rights to safe access of the medicine, and also demonstrated profitability while not deriving revenue from the cultivation or sale of the marijuana itself. As far as I know, we are the only company in the space to have accomplished those feats. With that being said we have stated in the past that investors should make informed decisions when buying our stock as the volatility may not be something the average retail investor can stomach."

Company executives also pointed out that most, if not all, of the other marijuana related public companies in the sector spend the majority of their operating budgets promoting their stocks through assorted public/investor relations firms and as a result show

operating losses quarter after quarter. Medbox does not have an investor relations firm and according to company executives its general preference has been not to operate with one through this period in the company's development until a reputable candidate is identified.

"Much of the investor interest in Medbox has occurred through financial press, financial media, and general media coverage chronicling advances in the medical marijuana industry, an industry in which we feel we are the most reputable company," stated Dr. Bruce Bedrick, Chief Executive Officer at Medbox, Inc. "Consequently, we spent much of last year trying to find a reputable firm that would be a good fit to handle our investor relations consistent with best industry practices, and now feel we have found the right fit for our company. We expect to announce more details some time after our Form 10 registration statement is filed with the SEC this week, as that is our main priority at present."

62.    On January 21, 2014, the Company filed yet another Registration Statement on Form 10 with the SEC. The Form 10 includes audited financial statements for the years ended December 31, 2012 and December 31, 2011. The Form 10 discloses that defendant Bedrick beneficially owned 24.7% of the Company's outstanding common stock and defendant Mehdizadeh beneficially owned or controlled 63.6% of the common stock. Inexplicably, the compensation paid to defendants Bedrick and Mehdizadeh in 2012 were now changed. According to the new Form 10, defendant Bedrick received $34,729 total compensation in 2012 in his role as CEO and a director, while defendant Mehdizadeh in his various titles received $262,500.

63.    The January 21, 2014 Form 10 includes the following financial statements which conflict, without any explanation, with those filed previously on OTCmarkets.com. According to the new Form 10: (a) as of September 30, 2013, the Company had total current assets of $3,338,218 (previously reported as $3,276,992) and as of December 31, 2012, total current assets of $3,495,156 (previously reported as $3,456,802); and (b) the Company's total assets were $7,422,866 (previously reported as $6,464,170) and $3,551,024 (previously reported as $3,512,670), for the third quarter of 2013 and full year 2012, respectively. The Form 10 discloses the following results of operations, also conflicting with the previously-filed quarterly report and also without explanation: (a) revenues for the quarter of $1,980,720 (previously reported as

$2,079,454); (b) revenues for the nine months ended September 30, 2013 of $4,801,062 (previously reported as $5,046,634); (c) net *loss* for the quarter of $178,925 (previously reported as net *income* of $258,945); and (d) net *loss* for the nine months ended September 30, 2013 of $43,825 (previously reported as net *income* of $388,284).   Notably the Form 10 makes no disclosure regarding a restatement of the Company's 2012 results nor does it refer to those results as restated.

64.     On February 14, 2014, the SEC issued a list of comments to Medbox regarding a wide range of deficiencies in the January 21, 2014 Form 10 including: (a) incorrect pagination; (b) misleading descriptions of Medbox's business and "geographic reach"; (c) failure to define key terms; (d) failure to include necessary attachments; (e) inconsistent description of territories where the Company served consulting clients (i.e., mentioning Oregon on one list and omitting Illinois, Nevada, and Oregon on another); (f) failure to provide a basis for the disclosed belief that Medbox was "positioned to be the leader in compliance and inventory control"; (g) failure to properly discuss revenue recognition; (h) in some places the Company stated it sold a certain number of machines during a certain quarter and in others the Company stated that it had sold the same number during the entire year; (i) inexplicably recording $190,400 in marketable securities as a liability; (j) disclosures stating there were no material changes in consolidated statement of cash flows during a certain period but disclosing significant changes in net cash from investing and financing activities during the same period; and (k) failure to explain a substantial salary increase for then-CEO Bedrick, in addition to numerous other problems.   The letter also states "please ensure that your disclosure [regarding defendant Mehdizadeh's criminal history] encompasses all aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution."

65.     On February 18, 2014, Citron Research released a report titled "Citron Busts Medbox for Multiple Frauds – Stock Is Worthless."   The Citron report points to the numerous apparent contradictions within Medbox's financial statements, past public statements, and on its website.   The report concludes, "This is a Full On Fraud... It is not as if Medbox is a company that has had a few reporting deficiencies amidst a small but growable business core.   Rather, everything they do seems to have an underlying purpose of deception."

66.   Later that same day, defendants Mehdizadeh and Bedrick caused the Company to issue a press release in response to the Citron research report.  The press release admits to past financial errors and states in part:

> Medbox . . . issued a status update to its shareholders on past, present, and future projects.  Company executives also commented on bloggers looking to discredit the company for financial gain and law firms looking to capitalize on misinformation in order to solicit clients.
>
> * * *
>
> Company executives clarified their position on the restatement of financials that accompanied the Form 10 registration statement filed with the SEC as a maturation process in becoming an SEC filer.
>
> "The company undertook a project to bring all accounting functions in house and during that lengthy process *we discovered some errors* in accounting which we have since corrected in the latest financials included in the Form 10. The point is getting it right and being fully transparent with our shareholders at all times," stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. "The company has, as part of those corrections, instituted better controls over financial reporting to avoid further corrections. In addition, it is important to note that revenues for the nine months of 2013 had increased over the comparative period of the prior year (as corrected) and we are continuing to add skilled people to accelerate our growth in 2014. Unfortunately, when you are the most visible company in the space, with a large market capitalization, you become a target."
>
> *Company executives caution company shareholders that while the media has been extremely supportive of Medbox as one of the only viable medical marijuana related public companies, with success there will always be opponents that publish deceptive and misleading articles about the company and its executives.*
>
> In addition, company executives clarified that the company offers support services to the medical marijuana sector on an arm's length basis. Often times in a state where applications are being accepted for marijuana dispensary licensing, some landlords would not lease to the newly formed non-profit entities formed for the company's clients.  As a result, in some rare instances and simply as an absolute benefit to their clients, it was agreed that Medbox would lease the properties and assign all rights to the applicant, with the permission of the landlord.
>
> "We go the extra mile for our clients and that is evident through our glowing testimonials displayed on our websites," stated Dr. Bruce Bedrick, CEO at Medbox, Inc. "Interestingly, with the recent banking policy guidance by the federal government, we can now start to develop an additional revenue stream of acquiring properties and leasing to our dispensary operator clients. This is one of many revenue streams that Medbox is actively developing given the current climate and relaxed federal posture."

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

24

(Emphasis added.)

67.     On March 10, 2014, defendants Mehdizadeh and Bedrick caused the Company to issue a press release titled *Medbox Issues Shareholder Update – Board to Pursue Listing on Major National Exchange During 2014*.  The Company press release stated:

> SEC reporting status, and other strategic items:
>
> The Company's Form 10 registration statement filed with the SEC will be effective as of March 22, 2014. The Company expects to respond to SEC comments and file audited 2013 year-end financials on a Form 10-K by the end of March.
>
> The board of directors is seeking to list Medbox with the NASDAQ Capital Markets or another national exchange by the end of 2014.
>
> The Company added public company experience with the additions of Thomas Iwanski at CFO, Matt Feinstein at Vice President, and also Mitch Lowe as the Company's first independent director.
>
> * * *
>
> "The last 90 days have been highly productive, and Medbox continues to lead this burgeoning new industry," stated Vincent Mehdizadeh, Board Chairman at Medbox, Inc. "We continue to take the steps to set Medbox apart from others in the industry, ensuring that we have the appropriate controls and resources in place and adding seasoned talent to lead future growth."
>
> Dr. Bruce Bedrick, Medbox President and CEO, added, "With the effectiveness of our Form 10 later this month, Medbox will be a fully reporting company.  Our pending status as a future SEC filer, as well as key additions to our management team, are important steps for strengthening the legitimacy of Medbox and increasing our ability to reach new investors and clients.   We look forward to continuing to exceed expectation in the coming months."

68.     On March 26, 2014, defendants Mehdizadeh, Bedrick and Lowe caused the Company to issue a press release titled *Medbox Completes SEC Filing Requirements – Company's amended Form 10 registration statement and audited 2013 financials to be filed with SEC by March 31, 2014*, which stated:

> . . . Medbox . . . today announced that it has completed the requisite steps to formally become a fully-reporting company as of March 24, 2014 and is now subject to the Securities and Exchange Commission reporting requirements.

---

On March 25, 2014, Medbox filed its requisite Form 3's. The Company expects to file its amended Form 10 registration statement, along with audited full-year 2013 financials, by March 31, 2014.

"This is a key step in our goal of listing our shares on a national exchange, and further evidence of our goal to maintain the highest standards for corporate governance and transparency," stated Vincent Mehdizadeh, Chairman and COO of Medbox, Inc. "It is of special importance to me personally that we are one of the only fully reporting public companies that has generated considerable revenues in the marijuana ancillary services sector and demonstrated an executable business plan. Our main subsidiary, Medicine Dispensing Systems, has turned a profit every year since commencing operations in 2010. These key differences set us apart from our competitors."

69.   On March 31, 2014, the Company filed with the SEC an amended Form 10, purporting to address the SEC's previously-described concerns.  This Form 10 listed the following defendants as the Company's officers and directors: (a) Bedrick, CEO and a director; (b) Mehdizadeh, COO and Chairman of the Board; (c) Iwanski, CFO; (d) Feinstein, Vice President; and (e) Lowe, director.   This was during the transition from Board 1 to Board 2.  Siegel and Feinstein were appointed about one week later and defendant Mehdizadeh stepped down.   In particular, the Form 10 inserts approximately two additional sentences in the disclosure regarding revenue recognition under the Company's critical accounting policies but contains no substantive changes.  This Form 10 includes the Company's audited financial statements for the year ended December 31, 2013 for the first time.   The Form 10 was signed by defendant Bedrick and contained the report of Q Accountancy expressing the opinion that Medbox's consolidated financial statements "present fairly, in all material respects, the financial position of Medbox." The Form 10 was now updated to contain the following disclosure regarding the legal problems of defendant Mehdizadeh:

During 2005-2008, Mr. Mehdizadeh was the non-attorney manager for a law firm. In 2008 the supervising attorney, Thomas R. Lee [...], whom clients had retained to handle their legal matters retired and left clients without representation. The department of consumer affairs of Los Angeles investigated the matter and decided to recommend prosecution against Mr. Mehdizadeh and not Mr. Mehdizadeh's attorney employer, Mr. Lee. After a 15 count criminal complaint was filed in 2010, in order to avoid a trial and ongoing bad publicity, Mr. Mehdizadeh pled no-contest in 2013 to two counts related to theft that resulted in probation. Under the terms of a negotiated plea agreement, Mr. Mehdizadeh voluntarily paid $450,000 in restitution to clients of Mr. Lee's office. Mr. Mehdizadeh accepted the terms of the

plea that provided that once Mehdizadeh's probation is complete, the record of the incident be deleted.  Mr. Mehdizadeh maintains his innocence and believes he was unfairly targeted.

70.     On April 1, 2014, defendants Mehdizadeh, Bedrick and Lowe caused the Company to issue a press release titled "Medbox Generates 102% Increase in Revenue for Fiscal 2013." The press release stated quotes defendant Mehdizadeh as stating "Our primary subsidiary, Medicine Dispensing Systems, has been profitable each year since commencing operations in 2010, and remains profitable today."  The press release also states in part:

> . . . Medbox . . . today announced record full-year revenue. Medbox included its audited numbers for the year ended December 31, 2013 in its amended Form 10 filing with the Securities and Exchange Commission.
>
> Recent Operational highlights:
>
> On March 24, 2014, the Form 10 registering Medbox's shares of common stock became effective with the Securities and Exchange Commission and Medbox is now a fully-reporting public company.
>
> The Company added public company experience, naming Thomas Iwanski as CFO, Matt Feinstein at Vice President, and also Netflix co-founder and former Redbox president Mitch Lowe as the Company's first independent director.
>
> * * *
>
> "This was a productive and exciting year for Medbox, and the first 90 days of 2014 have been even more productive," commented Dr. Bruce Bedrick, Chief Executive Officer of Medbox.  "We have solidified our position as the industry leader, and in the last three months we have taken specific steps to improve corporate governance, expand transparency and deliver shareholder value.  During the rest of 2014 we will grow organically, taking advantage of the tremendous momentum in the industry.  We will also leverage our reputation, presence in the industry, and our relationships to develop new revenue streams.  This will be an exciting year for Medbox, its clients and its shareholders."
>
> Full-year revenues were $5.2 million, a 101.7% increase compared to $2.6 million last year. The increase in revenues was due to primarily the result of recognizing revenue deferred from 2012 related to the completion of contracts for Arizona customers which was delayed by court action that was not resolved until 2013. Gross profit for 2013 was $2.6 million, or 50.5% gross profit margin, compared to gross profit of $1.5 million, or 59.4% gross profit margin for 2012.

---

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

The change in gross profit margin was due to increased costs related to the build-out of locations for clients and delays in implementing the Arizona program related to the litigation.

Total selling, general and administrative expenses were $3.2 million, or 61.2% of total revenues, compared to total selling, general and administrative expenses of $1.9 million, or 72.5% of total revenues last year. The loss from operations for the year was $(560,000), compared to a loss from operations of $(340,000) last year. Net loss for the year was $(557,000), or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss last year of $(344,000), or $(0.01) per basic and diluted share, last year.

While the Company's largest operating subsidiary, Medicine Dispensing Systems, remained profitable with a pretax profit of $948,443, the net loss for 2013 included $1.2 million in losses from the parent company's operations, related primarily to accounting and SEC attorney legal fees (related to the filing of, and subsequent withdrawing of, a Registration Statement on Form S-1, and the filing of a Form 10 registration statement in order to register the common stock of Medbox) and additional legal fees (related to litigation on behalf of Arizona clients to allow them to move forward with dispensary licenses the state of Arizona had awarded).  In addition, the Company's Vaporfection subsidiary, acquired on April 1, 2013, recognized a net loss of $317,000 for nine months of operations.

"Our primary subsidiary, Medicine Dispensing Systems, has been profitable each year since commencing operations in 2010, and remains profitable today," added Vincent Mehdizadeh, Chairman and Chief Operating Officer of Medbox, Inc. "However, public company costs, expenses related to financing efforts, and legal fees related to Arizona litigation resulted in a net loss for the public company.  We do not expect these expenses to impact our 2014 results, however, we are growing our infrastructure in anticipation of future growth, and expect additional fees related to public company costs as the Company pursues a listing on a national exchange."

Fourth Quarter Financial Results

Revenues for the fourth quarter ending December 31, 2013 increased to $423,000 compared to $47,250 for the same period of 2012.  The increase in revenues was due to an increased number of contracts signed and initial nonrefundable consulting fees.  Gross profit for the quarter was $278,000, or 65.7% gross profit margin, compared to a negative gross profit of $(508,000), or (10.8%) negative gross profit margin, in the fourth quarter of 2012. This was partially due to deferral of some revenue for Arizona contracts from 2012 to 2013 because of Arizona licensing stoppages by their authorities.

Total selling, general and administrative expenses significantly increased by $657,007 in the fourth quarter of 2013 compared to the same period of 2012, this is due to the fact that the Company incurred higher general and administrative expenses related to raising capital and regulatory compliance as described above.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

1

2

3

Net loss for the fourth quarter of 2013 was $(513,000) or $(0.02) per basic and $(0.01) per diluted share, compared to a net loss of $(533,000) or $(0.02) per basic and $(0.01) per diluted share for the fourth quarter of 2012.

4

5

6

7

71.     On April 11, 2014, the Company filed a Form 8-K disclosing that defendant Feinstein and Siegel had been elected to the Medbox Board of Directors on April 9, 2014.  The Form 8-K also disclosed that on April 10, 2014, defendant Mehdizadeh resigned as COO and director and was appointed "Senior Strategist and Founder of the Company."

8

9

10

11

12

13

14

15

16

17

18

72.     On April 11, 2014, the SEC issued a list of comments to Medbox regarding a wide range of deficiencies that remained uncorrected in the March 31, 2014 amended Form 10.  For example the SEC noted that again the Company had failed to file a document with the correct pagination.  The SEC "continue[d] to note inconsistencies between the description of [the] business in the registration statement and on the company's website."  The SEC requested, again, more complete disclosures regarding Medbox's revenue.  The SEC stated the Company had failed to sufficiently address its previous request to disclose its consideration of why Medbox "determined not to state separately its net sales and cost of sales of tangible products and its net sales and cost of sales for services."  The SEC also directed the Company to include specific language in a more complete disclosure of defendant Mehdizadeh's past criminal charges and plea:

19

20

21

22

> [R]evise your disclosure to state that Mr. Mehdizadeh pleaded "no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000" and that he was ordered to pay back $450,000 in restitution. We refer you to the Los Angeles County District Attorney's Office June 21, 2013 press release. Please tell us whether Mr. Mehdizadeh has already paid the $450,000 and if not, please revise the disclosure accordingly. Also, *please remove the last sentence beginning with "Mr. Mehdizadeh maintains his innocence . . ."*

23

(Emphasis added.)

24

25

73.     On April 15, 2014, in response to criticism from the SEC included in the April 11, 2014 letter, the Company amended the Form 8-K it had filed April 11, 2014.

26

27

28

74.     On May 13, 2014, the Company filed yet another amended Form 10 purporting to address the SEC's concerns expressed in the February 14, 2014 and April 11, 2014 letters.  As of the filing of this May 13, 2014 Form 10, the Company had never publicly disclosed the existence

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

29

of an Audit Committee or, if one existed, who its members were.  Nor was the existence of an Audit Committee mentioned in this Form 10.  The May 13, 2014 Form 10 states the following in part:

> We currently have seven full time employees.  We also use the services of 12 independent contractors.
>
> These independent contractors perform the services of accounting/bookkeeping support, machine maintenance, software support, marketing assistance, and also project manager duties in various localities nationwide.  In addition, most of our sales force is on independent contractor arrangements.  We currently have three independent contractors that constitute our sales force, including one who serves as sales manager, our newly appointed Vice President Matt Feinstein, and two sales agents. The Vice President receives a monthly base salary of $8,000 and the sales agents receive a monthly base salary of $1,000.  In addition, we pay commissions of approximately 5% on technology and consulting sales, which commissions are split between the Vice President and the sales agent that was assigned as the contact for the client.  We expect that Mr. Feinstein will become an employee of Medbox during the third quarter of 2014.

75.    On May 15, 2014, the Company filed its first Form 10-Q with the SEC for the quarter ended March 31, 2014.  Attached as exhibits to the 10-Q were the Sarbanes-Oxley certifications of defendants Iwanaski and Bedrick.

76.    Also on May 15, 2014, defendants Mehdizadeh, Bedrick, Lowe and Siegel caused the Company to issue a press release announcing its first quarter results reported in the Form 10-Q. The press release stated:

> "We continued to establish the company as the leader in the rapidly growing legitimate marijuana industry while increasing our transparency to the investment community and position in the capital markets," commented Dr. Bruce Bedrick, Chief Executive Officer of Medbox. "As this industry continues to evolve and redefine itself, Medbox is strategically positioned as the partner of choice with a growing array of solutions, technologies and services."
>
> Dr. Bedrick continued, "Across the country, states and municipalities evolve regulations regarding medical and recreational marijuana, and often struggle with the best ways to manage this change and address reasonable concerns.  The results we are reporting today are somewhat overshadowed by accounting provisions necessitated by changes in the business and legal environment in one of the markets in which we operate. Medbox stands at the forefront of this industry, offering solutions that help dispensary operators and cultivators maintain compliance and records that exceed regulatory requirements."

---

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

77.     On May 16, 2014, the SEC issued a report warning of "possible scams involving marijuana-related investments[,]" quoting Elisha Frank, co-chair of the SEC Enforcement Division's Microcap Fraud Task Force as stating "[w]henever we see incomplete or misleading disclosures, we act quickly to protect investors."

78.     On May 27, 2014, the SEC issued a letter to the Company describing deficiencies in the May 13, 2014 Form 10 and the May 15, 2014 Form 10-Q.  In particular, the SEC asked the Company for the third time to clarify its revenue recognition disclosures and stated the following:

> We note the allowances and refunds recorded in the first quarter due to a reduction in the number of licenses in the San Diego market *reversing $962,780 of previously recognized revenue*.... Please provide us with a detailed explanation of your basis for previously recognizing this revenue, including the specific milestones previously reached that made recognition of the revenue on the affected contracts appropriate. Also, please clarify your ongoing revenue recognition policy in terms of when it is appropriate to recognize revenue prior to obtain a license.
>
> * * *
>
> We note you have identified general and administrative expenses in the amount of $235,193 and $263,197 for the periods ended March 31, 2014 and 2013 as "Not explained." *Given the significance of these amounts to your financial statements, please expand your disclosure to include the reasons why you cannot explain what the expenses relate to and why the amount for the first quarter of 2014 decreased from the first quarter of 2013.*

(Emphasis added.)

79.     On June 10, 2014, the Company filed a Form 8-K disclosing a pair of transactions with PVMI, an entity controlled by defendant Mehdizadeh.  The first transaction is referred to in the Form 8-K as the "Bio Tech PSA" and is described as follows:

> Pursuant to the Bio Tech PSA, the Company sold to PVMI the Company's rights and claims attributable to or controlled by the Company as a result of the Company's transactions with Bio Tech Medical Software, Inc. (the "Bio Tech Rights and Claims"), in exchange for the return by PVMI to the Company of 30,000 shares of the Company's common stock. The amount of consideration paid by PVMI was determined based on the book value of the Bio Tech Rights and Claims and the closing price of the Company's common stock on June 5, 2014."

The second transaction is referred to in the Form 8-K as the "Medvend PSA" and is described as follows:

---

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

Pursuant to the Medvend PSA, the Company sold to PVMI the Company's rights and claims attributable to or controlled by the Company as a result of the Company's transactions with those three certain stockholders of Medvend, Inc. known as Kaplan, Tartaglia and Kovan (the "Medvend Rights and Claims"), in exchange for the return by PVMI to the Company of 30,000 shares of the Company's common stock. The amount of consideration paid by PVMI was determined based on the book value of the Medvend Rights and Claims and the closing price of the Company's common stock on June 5, 2014.

Attached to the Form 8-K are the purchase and sale agreements for both transactions. Both PSA's state they were approved unanimously by Medbox's then-Board, Board 2, on June 4, 2014 and are signed by defendant Feinstein on behalf of Medbox and defendant Mehdizadeh on behalf of PVMI.

80.     On June 5, 2014, Medbox shares closed at $20.16 per share.

81.     On July 1, 2014, Medbox issued a press release titled "Medbox Becomes a Fully Reporting Public Company – Company's Form 10 deemed effective by SEC," which states that Medbox "today announced that the Company's Form 10 filing has been deemed effective by the Securities and Exchange Commission, with no outstanding comments left to address."

82.     On July 24, 2014, the Company announced that defendant Bedrick was stepping down as the Company's President and CEO and that defendant Marsala would take his place. The Company also announced that defendant Marsala had been appointed to the Board and subsequently elected to serve as its Chairman.   Following his resignation as President and CEO of the Company, in August 2014, defendant Bedrick also stepped down from Medbox's Board. Defendant Bedrick, however, remained with the Company as a "consultant."

83.     On July 29, 2014, the Company filed a Form 8-K disclosing that Marsala was appointed as a director and CEO on July 23, 2014, and that defendant Bedrick had resigned as President and CEO.  Board 3 was now in place.  The filing also discloses that defendant Marsala's salary as CEO would be $330,000.

84.     According to the complaint subsequently filed by the Demand Board against defendant Medizadeh (detailed herein), in August 2014, the Company and defendant Mehdizadeh learned that the DOJ had served grand jury subpoenas on Q Accountancy, Medbox's then-accountant, and a CPA named Alex Anguiano.  The subpoenas sought "all documents related to

1   financial transactions involving Medbox." The service of these subpoenas and the existence of the
2   grand jury investigation were not disclosed to Medbox's public shareholders.

3       85.   On August 14, 2014, the Company filed its Form 10-Q for the quarter ended June
4   30, 2014. The Form 10-Q was signed by Marsala and defendant Iwanski.

5       86.   On August 15, 2014, defendants Mehdizadeh, Lowe, Siegel and Marsala caused the
6   Company to issue a press release entitled *Medbox Files 10-Q and Announces Quarterly*
7   *Conference Call*. The Form 10-Q Medbox filed with the SEC that day for the financial period
8   ended June 30, 2014 was signed by Defendant Marsala and reported that the Company had
9   achieved revenues of $434,448 and a net loss of $1.4 million in 2Q 2014. The Form 10-Q states
10  that "[r]evenue was down for the current period as delays in adoption of final regulations in certain
11  states and the ultimate timing of the application process in states with final regulations reduced
12  and delayed the opportunity to apply for new licenses and consequently delayed the notice of the
13  results of any license application made." The Form 10-Q also states that "revenue was further
14  reduced by additional sales allowances and refunds recorded due to a legislative change in the San
15  Diego market area which reduced the ability of certain clients to obtain licenses and triggered
16  certain contract refunds."

17      87.   On August 22, 2014, the Company filed a Form 8-K disclosing that defendant
18  Bedrick had resigned as a director on August 18, 2014 but would continue to serve as a consultant
19  to Medbox and would earn a monthly fee of $12,500 in that capacity.

20      88.   On August 27, 2014, the Company uploaded to the investor relations portion of its
21  website a charter for the Audit Committee of the Board, purportedly adopted August 6, 2014. The
22  charter states that the Audit Committee "shall be made up of at least three members of the Board
23  who meet the independence and other requirements of the Securities and Exchange Commission."
24  At this time, the composition of the Audit Committee was not disclosed and there were not three
25  independent directors on Medbox's Board to form the Committee.

26      89.   On October 17, 2014, the Company filed a Form 8-K disclosing that as of October
27  13, defendant Mehdizadeh had resigned as an officer of Medbox but would continue to serve as a
28  consultant to the Company, with the title of "Founder and Senior Advisor," and would earn

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
ABUSE OF CONTROL

1  $25,000 in that capacity per month, or $300,000 per year – effectively the same amount as the
2  Company was paying its CEO, defendant Marsala.

3      90.    On October 21, 2014, the Company filed a Form 8-K disclosing that defendant
4  Iwanski had resigned as CFO and defendant Mitchell would serve as the new CFO. The Company
5  agreed to pay defendant Iwanski severance and issued him 100,000 Restricted Stock Units "for his
6  service to the Company."

7      91.    On October 27, 2014, the Board appointed a special committee consisting of
8  defendants Lowe, Siegel, Love, and Marsala – the entire Medbox Board. The special committee
9  was to investigate whether evidence of wrongdoing existed as to: (a) the documents sought by the
10  grand jury and the subpoenas served on the Company's accountants; or (b) the allegations in a
11  letter to the SEC from a former employee of Medbox including allegations of insider trading and
12  other securities fraud against Mehdizadeh. The formation of the special committee and the
13  allegations in the letter to the SEC were not immediately disclosed.

14      92.    On October 28, 2014, the Company filed a Form 8-K with the SEC disclosing that
15  Love had been elected to the Board on October 22, 2014. The Form 8-K for the first time
16  disclosed in an SEC filing the existence of an Audit Committee of the Board of Medbox when it
17  stated Love "was also elected to serve as Chairperson of the Audit Committee." If any other
18  director served on the Audit Committee it was not disclosed.

19      93.    On October 31, 2014, the Company filed a Form 8-K with the SEC disclosing that
20  defendant Feinstein had resigned as a director of the Company on October 30, 2014 but would
21  remain employed as a vice president of Medbox. The Demand Board was now fully in place.

22                                **THE TRUTH BEGINS TO EMERGE**

23      94.    Also on October 31, 2014, the Company filed a Form 8-K with the SEC disclosing:

24  On October 27, 2014, the Board of Directors of Medbox, Inc. (the "Company")
   appointed a special board committee, composed of all four of its current directors,
25  that is, three independent directors and its recently appointed Chief Executive
   Officer/Chairman of the Board, to investigate (i) *a letter from a former Company*
26  *employee to the Securities and Exchange Commission alleging wrongdoing by a*
   *former officer of the Company who is currently a consultant to the Company,* and
27  (ii) *a federal grand jury document subpoena served in August 2014 on the*
   *Company's accountants by the U.S. Department of Justice, to ascertain what*

28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
ABUSE OF CONTROL

1    *implications, if any, the subpoena or the letter may have with respect to the*
     *Company.*

2    (Emphasis added.)

3        95.    At some time during November 2014, Medbox and various former directors and

4    officers of the Company, including Mehdizadeh, received subpoenas from the SEC.  The SEC

5    subpoenas sought documents and testimony related to the Company's revenue recognition

6    policies, financial disclosures, private placements of stock, and third parties who had invested in

7    or otherwise engaged in financial transactions with Medbox.

8        96.    On November 3, 2014, a press release was issued by defendant Mehdizadeh titled

9    "Medbox Comments on Recent 8-K Filing."   The press release, which appeared neither in a

10   Medbox SEC filing nor on the Company's investor relations page, states in part:

11   LOS ANGELES, Nov. 3, 2014 /PRNewswire/ -- *Medbox, Inc.*, (OTCQB: MDBX),
     the leading licensing, infrastructure and security specialist, patented technology
12   provider, and partner to the cannabis industry, commented on the recent 8-K filing
     discussing matters pertaining to a former employee of the company who filed an
13   employment claim and sent a letter to certain government agencies asserting claims
     against the Company. *The former employee subsequently lost the employment*
14   *claim.* However, the Company is now internally investigating the letter's contents to
     ascertain validity of the claims.
15

16   The 8-K references that the Board of Directors of Medbox, Inc. appointed a special
     board committee to investigate, review, and evaluate a letter involving the
17   Company, sent in May 2014 to certain government agencies by a former employee
     of Medbox. *Within the last few weeks, Medbox was awarded a judgment against*
18   *this employee* on his employment claims, which demanded $1.5 million in damages
     related to the Company's alleged wrongdoing. Prior to litigation of the employment
19   claim, and after repeated settlement demands were made by the former employee
     and rebuffed by Medbox, the employment claim was filed and sent along with a
20   letter to government agencies by the former employee, alleging wrongdoing by the
     company.
21

22   Mr. Vincent Mehdizadeh, Founder and Consultant to Medbox stated, "The former
     employee vowed to retaliate against the Company in any way he could after his
23   illegal cash demands of the company were ignored. It now appears that writing a
     letter to government agencies filled with factual inaccuracies and blatant falsehoods
24   was the most effective way to facilitate that goal."
25

26   Current management commented that the Company has not found any indications
     that the subject matter contained in the letter is true concerning the conduct of prior
27   officers of the company.  However, the company's internal investigation on the
     matter is still in process. *The Company also clarified that no subpoenas have been*
28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
ABUSE OF CONTROL

35

*served on the Company, it's current or former officers, or anyone affiliated to the Company.*

Mr. Mehdizadeh added, "I painstakingly put together the best management team and Board of Directors in our sector for a reason, and in their judgment this voluntary disclosure is what good public companies that have nothing to hide should do. The company will continue to demonstrate to shareholders, the investment community, and all other public company participants in the cannabis sector, how a well-run and respectable public company should operate. Medbox has and will continue to be the gold-standard for accountability."

(Emphasis added.)  No judgment against a former employee, or any litigation involving one, had been disclosed in the Company's public filings.

97.   On November 4, 2014, *TheStreet.com* published an article titled "Medbox Says Ex-employee Wrote Letter to SEC, Accountants Subpoenaed," which states in part:

While Medbox did not identify the former officer who is the subject of the letter to the SEC, the company's own filings show that three officers resigned this year and stayed on as consultants.

Mehdizadeh resigned as COO and director in April, but was then appointed as a senior strategist.  He resigned again last month, retaining a relationship as a consultant.

Bruce Bedrick resigned as CEO in July and resigned from the board in August, remaining as a consultant.

CFO Thomas Iwanski resigned last month, but agreed to stay on as a consultant.

98.   On November 6, 2014, defendant Mehdizadeh issued a press release, this time under his own name, stating "Online Publication Retracts Headline Implying Medbox is Under Investigation."  The press release states in part:

LOS ANGELES, CA / ACCESSWIRE / November 6, 2014 / P. Vincent Mehdizadeh - Founder and Majority shareholder of Medbox, Inc. (OTCQB: MDBX) commented today that online publications, thestreet.com and thedeal.com retracted a headline that *incorrectly asserted that Medbox is under investigation by the SEC.*

"I am personally relieved that the headline and key pieces of the article were corrected," commented Mehdizadeh. "However, the damage to investor confidence yesterday was substantial and I am meeting with my legal team to discuss possible remedies available to make an example out of this online publication and to ensure incorrect information is never disclosed about the company again."

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

36

(Emphasis added.)

99.    On November 7, 2014, the Company filed a Form 8-K with the SEC stating:

> The news release issued Monday, November 3, 2014 under the headline "Medbox Comments on Recent 8-K Filing" *was not authorized by Medbox, Inc.* (the "Company") for distribution. The 8-K filed by the Company on Friday, October 31, 2014, should be used as a reference for information regarding this matter. The filing is available on the website of the Securities and Exchange Commission.

(Emphasis added.)

The SEC Investigation

100.    On November 12, 2014, the Company filed its Form 10-Q with the SEC for the quarter ended September 30, 2014.  The Form 10-Q reiterates that, contrary to the statements in the November 3, 2014 press release, the SEC had issued a subpoena to the Company.  The Form 10-Q states in part:

> On November 10, 2014, the Los Angeles Regional Office of the Securities and Exchange Commission (the "SEC") notified the Company that *it is conducting an investigation pertaining to the Company and issued a subpoena to the Company for documents from December 1, 2011 to the present* relating to the matters it is reviewing. The Company plans to cooperate fully with the SEC staff to complete the investigation on a timely basis.

(Emphasis added.)

101.    On December 2, 2014, the Demand Board informed defendant Mehdizadeh that its members believed Medbox had incorrectly recognized revenue under his leadership.  Mehdizadeh responded by threatening to remove the Board.

102.    On December 4, 2014, defendant Mehdizadeh threatened to remove the entire Board via written consent and then informed the Company's directors and officers they were "terminated as officers of any and all Medbox companies, with cause, effective immediately." Mehdizadeh thereafter agreed to withdraw his termination demand.

103.    On December 12, 2014, Medhizadeh again threatened to fire Medbox management.

104.    On December 22, 2014, the Company filed a Form 8-K with the SEC disclosing: "On December 16, 2014, the Board of Directors of Medbox, Inc. (the "Company") amended the Company's Amended and Restated Bylaws to prohibit action by written consent without a

1  meeting of the stockholders of the Company." This modification of the Company's bylaws could

2  only have been target at the actions of one individual: defendant Mehdizadeh, the Company's

3  majority shareholder and the only person able to take any action by written consent.

4  <u>The Restatement</u>

5        105.  On December 30, 2014, the Company filed a Form 8-K with the SEC disclosing,

6  among other things, that the Company had been served with a subpoena for the federal grand jury

7  and that Medbox would be required to restate its financial statements for the full year 2013 and the

8  first three quarters of 2014. The Form 8-K also disclosed that "[o]n December 22, 2014, the

9  Board of Directors of the Company amended the Company's Amended and Restated Bylaws to

10  permit action by written consent without a meeting of the stockholders of the Company,

11  effectively rescinding the amendment entered into on December 16, 2014." The reason for this

12  abrupt reversal, and what Mehdizadeh promised the Demand Board in return, has not been

13  disclosed. The Form 8-K also states in part:

14  > On December 24, 2014, the Board of Directors of the Company determined to
15  > *amend and restate the financial statements of the Company for the year ended*
16  > *December 31, 2013, the third and fourth quarters of 2013 and the first three*
   > *quarters of 2014.*

17  > In October 2014 the Board of Directors of the Company appointed a special board
18  > committee (the "Special Committee") to investigate a federal grand jury subpoena
   > pertaining to the Company which was served upon the Company's accountants as
19  > well as certain alleged wrongdoing raised by a former employee of the Company.
   > *Thereafter the Company received subpoenas from the federal grand jury and the*
20  > *Securities and Exchange Commission.* In connection with its investigation of these
   > matters, the Special Committee in conjunction with the Audit Committee initiated
21  > an internal review by management and by an outside professional advisor of certain
   > prior period financial reporting of the Company. The outside professional advisor
22  > reviewed the Company's revenue recognition methodology for certain contracts for
   > the third and fourth quarters of 2013. As a result of certain errors discovered in
23  > connection with the review by management and its professional advisor, the Audit
   > Committee, upon management's recommendation, concluded on December 24,
24  > 2014 that the consolidated financial statements for the year ended December 31,
   > 2013 and for the third and fourth quarters therein, as well as for the quarters ended
25  > March 31, 2014, June 30, 2014 and September 30, 2014, together with all three, six
   > and nine month financial information contained therein, should no longer be relied
26  > upon and will be restated to correct the errors. Therefore, all earnings press releases
   > and similar prior communications issued by the Company as well as other prior
27  > statements made by or on behalf of the Company relating to financial reporting or
28  > results for those periods should not be relied upon. Lastly, as part of the

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
ABUSE OF CONTROL

investigation process, *the Company will also examine its financial statements for 2012 and the first two quarters of 2013 and if necessary correct those as well.*

The errors which led to the announced restatements relate to revenue recognition on some contracts with customers as to which it appears that *revenue had been recognized too soon. The company intends to correct the errors in its financial statements to bring them into conformity with accounting principles generally accepted in the United States of America (GAAP) and SEC regulations.* The restated financial statements will recognize revenue at a later time as up-front payments are recognized over the longer of the contract period or the customer relationship, revenue is deferred until key contingencies are removed and it is clear the revenue has been earned in accordance with GAAP and SEC regulations. The Company's internal review, including a review of the practices and procedures that led to the errors, preparation of fourth quarter and full year 2014 financial statements and restatement of prior periods are not yet concluded, and the actual impact of the revenue recognition corrections and other adjustments that may arise from the ongoing internal review of the Company's prior and future financial results *may vary materially.*

As a result of the preliminary findings of the ongoing internal review, management is continuing to assess the Company's disclosure controls and procedures and internal controls over financial reporting. The Company does not expect to reach a final conclusion as to this assessment until completion of the restatement process. Since management has not completed its assessment of its disclosure controls and procedures, including internal control over financial reporting, there can be no assurance that additional control deficiencies that could be material weaknesses will not be identified. The Company has previously disclosed that its disclosure controls and procedures and internal controls over financial reporting were not effective.

The Chief Financial Officer of the Company discussed these matters with the Company's independent registered public accounting firm, Q Accountancy Corporation.

\* \* \*

Guy Marsala, the Chief Executive Officer of the Company and a member of the Special Committee, has determined to resign from the Special Committee, effective as of December 16, 2014, in order for the members of the Special Committee to consist exclusively of outside independent directors.

(Emphasis added.)

106.    On the same day, the Company issued a press release covering the subject matter of the Form 8-K.  The press release states that the Company "plans to engage an independent CPA firm to consult with and assist the Company's staff in preparing the restated financial statements as soon as possible."

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

39

107.   Also on December 30, 2014, defendant Mehdizadeh issued a letter to Medbox shareholders.  In the letter, defendant Mehdizadeh stated in his view no independent CPA was necessary and doubled-down on his failed accounting and that of former-CFO Iwanski and the Q Accountancy auditor.  The letter states in part:

> "Up until 3 months ago, *I was involved in almost every decision the company made....*  In my opinion, one of the keys to Medbox's success has been superior corporate messaging and timely dissemination of information to our shareholders.
>
> Since that point in time a little over two years ago, I have made it my mission to take the company from being a non-reporting pinksheet to being a fully reporting SEC Filer. I took it upon myself to set these goals and achieve them for the benefit of the company and its shareholders. We did this to have an increased level of transparency so that investors can think of Medbox as the public company standard for respectability and reliability in the newly emerging marijuana industry that was taking shape. As a result, we engaged a Public Company Accounting and Oversight Board (PCAOB) registered auditor, Q Accountancy Corporation, and also hired a full-time Chief Financial Officer, Thomas Iwanski, a CPA with excellent references and extensive public company experience.
>
> Since the company engaged Mr. Iwanski and Q Accountancy Corporation, I also recruited a star-studded board and together we appointed Guy Marsala to lead the company as the Chief Executive Officer. As it was explained to me, in situations where a new CEO is brought on, they typically look to appoint their own Chief Financial Officer. Thus, when Mr. Marsala decided to replace Mr. Iwanski as CFO, I did not give it a second thought, although I was sad to see him go since his experience with public company oversight was superb.
>
> Today, the company's current management issued a statement regarding the company's financials. *Prior management, including Mr. Iwanski and the company's current auditor, both disagree with current management's position on the matter. Both the current auditor and prior CFO have made their opinions known to current management, to no avail.* Both have stated that they had support for recognizing revenue in the periods in which they were recognized. However, the company's current CFO has a difference of opinion on that aspect and believes that the revenue in question should be recognized in later periods, which has now resulted in a proposed restatement set to occur. *This fact along with the fact that the revenue items in dispute amount to less than 10% of the total revenue booked for 2013, was not accurately discussed in the disclosure released this morning.*

(Emphasis added.)

108.   According to a court filing later made by the Company, this press release was "false and/or misleading" in that it misleadingly minimized the extent of accounting problems.

---

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

109.   On December 31, 2014, the Company filed a Form 8-K with the SEC disclosing that on December 17, 2014, the Company appointed Siegel as the Chairman of the Board. The accompanying press release states:

> Mr. Guy Marsala, Medbox CEO, commented, "Over the course of this year, Medbox has evolved from an entrepreneurial firm to a professionally managed organization with a world class management team and Board of Directors."

110.   On January 9, 2015, the Company filed a notice of action by written consent of stockholders. The form disclosed that defendant Mehdizadeh had used his power to act by written consent without a meeting to remove *the entire Board* and install directors loyal to him. Pursuant to the written consent, effective January 29, 2015, Medbox's Board of Directors would become: defendants Feinstein, Ortega, Trecek, and Mehdizadeh. The disclosure states in part:

> This Information Statement… is being furnished to the holders ("Stockholders") of the class of Common Stock, par value $0.001 per share ("Common Stock"), and Preferred Stock, $0.001 par value, of Medbox, Inc., a Nevada corporation ("Company"), by Mr. P. Vincent Mehdizadeh who is the beneficial owner of a majority of the voting power of the Company ("Majority Stockholder"). Mr. Mehdizadeh is the president and controlling shareholder of both PVM International, Inc., a California corporation ("PVMI") and Vincent Chase, Inc.,[6] a California corporation ("VCI").

> The purpose of the Information Statement is to provide notice that, on January 9, 2015 ("Consent Date"), the Majority Stockholder, PVMI and VCI executed a written consent ("Consent Action"), as permitted under Nevada law and the Amended and Restated Bylaws of the Company, as further amended ("Bylaws"), approving the election of four (4) successor directors as the Company's entire board of directors to serve until the next annual meeting of stockholders and until their successors are elected and qualified. After the effective time of the Consent Action, the board of directors and the Majority Stockholder may decide to add additional directors, including persons who formerly served as officers or directors of the Company.

111.   On January 16, 2015, the Company filed a complaint in Los Angeles Superior Court disputing the legal effectiveness of the January 9, 2015 written consent. According to the Company's complaint, the Demand Board has discovered "significant" evidence related to Mehdizadeh's conduct while employed in various capacities at Medbox. The complaint states that Mehdizadeh: (a) engaged in manipulation of Medbox's revenue recognition and other financial

---

[6]   Vincent Chance, Inc. ("VCI") is an entity wholly owned by defendant Mehdizadeh.

1  disclosures; (b) made public statements related to Medbox that contained false and/or misleading

2  information; (c) potentially violated numerous securities laws; (d) engaged in what appear to be

3  improper transactions involving third-party affiliates; (e) made material misrepresentations to

4  Medbox investors and/or potential investors; and (f) ignored and/or attempted to hide significant

5  accounting and other financial control and oversight issues existing at Medbox.

6      112.   On January 21, 2015, the Company, defendant Mehdizadeh, and Mehdizadeh's

7  wholly owned entities, PVMI and VCI, entered an agreement to resolve the action filed on January

8  16. Pursuant to the agreement: (a) Mehdizadeh and his entities canceled and withdrew the written

9  consent; (b) the Company and Mehdizadeh and his entities agreed to vote in favor of and not

10 remove defendants Siegel, Lowe, Love, and Marsala for a period of 12 months; (c) Medbox would

11 dismiss its complaint; (d) the Board would meet with defendant Mehdizadeh on specified dates to

12 discuss matters of interest or concern to defendant Mehdizadeh "as a stockholder of the

13 Company"; (e) Mehdizadeh would have the right to appoint a person nominated by him to be a

14 fifth member of Medbox's Board; and (f) Mehdizadeh and his entities would, on or before January

15 25, 2015, obtain a $1 million investment in Company stock via a private placement.  Notably,

16 however, the Demand Board did not pursue financial damages against defendant Mehdizadeh.

17 The agreement additionally stated:

18      **Consulting Arrangements and Contact with Staff.** VM confirms that all prior
   consulting agreements or similar arrangements between him and Medbox or any of

19      its subsidiaries have been terminated,[7] and that for a period commencing on the
   date of this Agreement and terminating upon the end of the Voting Agreement

20      Term, *VM will not (i) seek or purport to act on behalf of Medbox or any subsidiary*
   *as a consultant, agent, or otherwise* or (ii) except as authorized by the Board or this

21      Agreement, *contact or interfere with any Medbox employees, consultants, directors*

22      *or shareholders, whether on or off Medbox's premises and whether in person, by*
   *mail, email, Edgar filings, the internet, press releases, other form of public*

23      *announcements, or in any manner.* Notwithstanding this Section, VM Group
   shall be permitted to have a supervised visit at Medbox's headquarters where they

24      can gather personal belongings and make copies of files for the purpose of
   compiling a financial summary prepared by an accounting firm to disclose to

25      Medbox and Medbox's financial consulting firm for assistance with its

26      investigation of the 2012, 2013 and 2014 financial statements. VM Group will also

27

28   [7]    "VM" means defendant Mehdizadeh.

be allowed to provide to Medbox an operations summary to assist current management in running the business.

* * *

**Board Consultations with VM.** During the Voting Agreement Term, Medbox shall cause one or more of its directors, initially Siegel, to meet and confer in good faith with VM not less infrequently than semi-monthly (or on a different frequency as mutually agreed by Medbox and VM) to hear and discuss any matters of interest or concern of VM, as a shareholder of Medbox. These matters shall initially include, but are not limited to (i) adequacy of Medbox's staffing, (ii) implementation of new consulting arrangements related to executed amendments to client consulting agreements previously agreed to by Medbox but not yet tendered to clients as promised, to ensure client satisfaction and (iii) Medbox's completion of its evaluation, through Singer Lewak, of its prior period financial reporting

113.    Concurrently, the Demand Board, the Company, defendant Mehdizdeh, PVMI, and VCI entered a voting agreement. Pursuant to the voting agreement, defendants Mehdizadeh, Siegel, Low, Love, Marsala, PVMI, and VCI agreed to vote their Medbox shares to: (a) maintain the Board as five members; and (b) elect defendants Siegel, Lowe, Love, and Marsala. The agreement likewise prevents any of the parties to it from taking "any action to remove" defendants Siegel, Lowe, Love, or Marsala

114.    At present, Medbox is the subject of an SEC investigation and the Company and/or one or some of the defendants named herein are implicated in the DOJ grand jury investigation. As securities class action was filed against the Company, in the U.S. District Court for the Central District of California, also on January 21, 2015, Case No. 2:15-cv-00426, naming defendants Mehdizadeh, Bedrick, Iwanski, Marsala, and Mitchell. Medbox common stock, which was trading above $30 per in share in April 2013 is currently trading at approximately $0.06 per share.

115.    On February 6, 2015, the Company issued a Form 8-K disclosing that the Board had appointed a new independent Auditor, Marcum LLP, and "effectively dismissed" Q Accountancy, "other than with regard to any restatement of the Company's financial statements for periods prior to the fiscal year ending December 31, 2014." Attached as an exhibit to the Form 8-K was a letter from Q Accountancy stating in part:

We have read the statements made by Medbox Inc., which we understand will be filed with the Securities and Exchange Commission, pursuant to Item 4.01 of Form 8-K, as part of the Form 8- K of Medbox, Inc. dated February 5, 2015. We agree

with the statements concerning our Firm in such Form 8-K. However, on December 30, 2014, Medbox, Inc. filed with the Securities and Exchange Commission a Form 8-K that included certain matters pursuant to Item 4.02 regarding revenue recognition methodology for certain contracts. As of February 5, 2015, we have not reviewed or performed any additional procedures on the outcome of those matters. We have no basis to agree or disagree with any other statements made under Item 4.01.

116.    On March 4, 2015, defendant Mehdizadeh disclosed that he had agreed to sell the majority of Medbox shares under his control to Lizada Capital LLC for approximately $15 million.

117.    On March 9, 2015, the Company filed a Form 8-K describing the results of its financial review.  The Form 8-K stated in part:

As a result of certain errors described below, discovered in connection with such comprehensive review, the Audit Committee, upon management's recommendation, concluded on March 6, 2015 that, in addition to the restatements announced in the Original 8-K, the consolidated financial statements for the year ended December 31, 2012, together with all three, six and nine month financial information contained therein, and the quarterly information for the first two quarters of the 2013 fiscal year, should no longer be relied upon and will be restated to correct the errors. Therefore, all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to financial reporting or results for those periods should not be relied upon.

Management and its professional advisor have completed the review of revenues recognized and related contracts for the years 2012 and 2013 and interim period for the nine months ended September 30, 2014. Conclusions thus far from the review include:

1) revenue on some contracts with customers was recognized before all required revenue recognition criteria were met, resulting in an overstatement of revenue in ranges of approximately $1,300,000 to $1,500,000, $3,000,000 to $3,200,000 and $600,000 to $900,000 for the years 2012, 2013 and the nine months ended September 30, 2014, respectively;

2) certain transactions with related parties in ranges of approximately $500,000 to $600,000 and $800,000 to $900,000, for 2012 and 2013, respectively were improperly recorded as revenue instead of additional paid in capital in stockholders' equity; and,

3) certain inventory costs were capitalized improperly resulting in an understatement of cost of sales. Costs of approximately $600,000 and in a range of approximately $1,300,000 to $1,400,000, for 2013 and the nine months ended

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

44

September 30, 2014, respectively previously reported in inventory in 2013 and 2014, respectively, will be recorded as cost of sales in the statement of operations for 2013 and the nine months ended September 30, 2014, respectively. These costs incurred prior to executing a contract with a customer, seeking licenses and locations and closing on real estate to operate a dispensary or cultivation center should have been recorded as current period expense.

118.   On March 10, 2015, plaintiff Calabrese filed his verified shareholder derivative complaint in this Court.

119.   On March 11, 2015, the Company filed an amended Form 10 containing its restated financial results.

120.   On March 26, 2015, the Company filed with the SEC its Form 10-K for the 2014 fiscal year.  The Form 10-K reported that during 2014, the Company's legal costs had increased $1.02 million in 2014 as compared to 2013.

121.   On March 27, 2015, plaintiff Gray filed his verified shareholder derivative complaint in this Court.

122.   On May 15, 2015, the Company filed with the SEC its Form 10-Q for the first quarter of 2015.  The Form 10-Q disclosed that during the first quarter of 2015, the Company's legal costs had increased from $74,960 during the first quarter of 2014 to $259,993 during the same quarter of 2015.

123.   On July 7, 2015, the Company disclosed that on June 30, 2015 defendant Marsala had resigned and would be replaced as President and interim CEO by Jeffrey Goh, previously the COO of Medbox since April 22, 2015.

124.   To date, the Company has not been compensated for the significant financial harm caused by defendant Mehdizadeh's wrongdoing or the breaches of fiduciary duties of the Demand Board members, nor have the necessary corporate governance enhancements been made.

**ADDITIONAL EVIDENCE DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

125.   As detailed herein, defendants breached their fiduciary duties by completely misrepresenting Medbox's financial condition and business, declining to implement even the most basic and rudimentary of internal controls over Medbox's financial disclosure and accounting,

1  concealing a federal grand jury investigation implicating Medbox so they could sell their company

2  stock before it crashed, concealing defendant Mehdizadeh's criminal past and ongoing criminal

3  activities at Medbox, and, declining to sue and hold accountable the wrongdoers, including

4  themselves and their fellow board members even though they were on actual notice of *all* of this

5  wrongdoing.

6      126.   In addition to all to their breaches of fiduciary duties in connection with all of the

7  wrongdoing alleged above, defendants additionally breached their fiduciary duties in connection

8  with the foregoing:

9  A.    Defendants Actively Concealed Mehdizadeh's Continued Control of Medbox's Operations

10     127.   At times relevant hereto, the other defendants were well aware of Mehdizadeh's

11  sordid history and crimes of moral turpitude, and actively participated in the concealment from

12  Medbox shareholders of both Mehdizadeh's history and his active participation in the Company's

13  day-to-day business.

14     128.   According to a confidential witness ("CW") in the related securities fraud case,[8]

15  who worked for Medbox in 2014 and reported directly to defendant Feinstein, defendant Marsala's

16  appointment as CEO by the Board was devised as an artifice to falsely convey that defendant

17  Mehdizadeh was not in control of the company.  According to CW, there were discussions about

18  defendant Mehdizadeh's title and his title was changed several times to decrease the appearance of

19  his involvement in the day to day business of, and control over, the company.  According to CW,

20  defendant Feinstein stated Mehdizadah did not have an official title with the Company because of

21  his shady history and because the defendants wanted shareholders not to know that Mehdizadah

22  was still in control.

23     129.   CW's account is confirmed by Medbox's public filings.  For example, on April 11,

24  2014, defendants caused Medbox to file a Form 8-K with the SEC stating that defendant

25  Mehdizadeh had resigned as COO and a director, and now had the title of "Senior Strategist and

26  Founder."  The Form 8-K did not disclose the responsibilities associated with this new title.

27  _____

28  [8]   *Crystal v. Medbox Inc., et al,* Case No. 2:15-cv-00426–BRO-JEM, pending in the United
States District Court for the Central District of California.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
ABUSE OF CONTROL

1  However, as evidenced by later disclosures, this was at least an officer level position. On October

2  17, 2014, the Company disclosed that defendant Mehdizadeh had resigned as an officer but would

3  continue to serve as "Founder and Senior Advisor."

4      130.   This charade notwithstanding, defendant Mehdizadeh remained in control of

5  Medbox as its largest shareholder and maintained operational control over the Board and the

6  Company's day-to-day business. For example, according to CW, all applications for approval to

7  do business and sell dispensing machines in a given state were reviewed and approved by

8  defendant Mehdizadeh. CW described defendant Mehdizadeh's fraudulent conduct in connection

9  to this process: for example, application fees for a particular state were $500,000 and each

10  application also required proof of an additional $500,000 as a security deposit in the event the

11  application was approved. CW stated the Company did not have sufficient funds for the security

12  deposits. In order to circumvent this problem, defendant Mehdizadeh would deposit funds,

13  receive the deposit slip, and then withdraw the money to be used for other applications in order to

14  give the appearance to state authorities that Medbox had funds that it did not in fact have.

15      131.   Defendant Mehdizadeh at times misrepresented his involvement in the Company's

16  business by telling investors that he had no financial interest in the dispensaries that Medbox

17  supposedly serviced. "I have no financial interest in any of these dispensaries other than making

18  sure that the clients that we have been hired to represent obtain licensing." However, this was a

19  lie. According to an article on *SouthCoastToday.com*, "In various Phase 1 application filings with

20  the Department of Public Health – which is overseeing medical marijuana in Massachusetts –

21  Mehdizadeh wrote in a form letter that he has 'over $62 million in available assets, and pledges $1

22  million for setting up dispensaries.'" Additionally, two license applicants in Massachusetts "listed

23  Mehdizadeh's company Vincent Chase LLC as their financier …"

24      132.   Defendants, and the members of the Demand Board, knew of these practices and

25  permitted them to occur. This resulted in the obfuscation of defendant Mehdizadeh's true depth of

26  involvement in Medbox's day-to-day activities, as well as his illegal and improper business

27  practices.

28  B.   Defendants Caused Medbox To Improperly Recognize Revenue

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

133.    In late 2012, Medbox obtained 20 dispensary licenses for clients in Arizona. The Individual Defendants made a practice of improperly recognizing revenue before it was actually earned on these contracts.  This practice violated Generally Accepted Accounting Principles and various SEC regulations.

C.    Defendants Permitted And Engaged In Rampant Insider Trading

134.    The individual defendants, including defendants Mehdizadeh, Bedrick, Lowe, and Siegel, sold more than $2.5 million worth of their personally held Medbox stock at times when they were in possession of undisclosed negative material information.

135.    As demonstrated below, nearly all of the stock sales made by Defendants Mehdizadeh, Bedrick, Lowe, and Siegel occurred while those individuals knewt the DOJ had served grand jury subpoenas on Medbox's accountants and before this had been disclosed to Medbox's shareholders.

136.    Defendant Medhizadeh executed the following stocks sales at times he was in possession of undisclosed negative information about Medbox:

    a.    In June 2014, defendant Medhizadeh caused PVMI to make his first ever publicly reported sales of Medbox stock: 69,585 shares for proceeds of approximately $500,000.

    b.    Including the June sales, between June 2014 and December 29, 2014, defendant Mehdizadeh and entities he controlled sold over 171,000 shares of Medbox stock in 85 separate transactions for proceeds of over $1.43 million.  These sales occurred at a time when, according to the complaint filed against Mehdizadeh and subsequently settled by the Demand Board, Mehdizadeh knew the DOJ had served grand jury subpoenas on Q Accountancy in connection with Medbox's financial wrongdoing.

137.    Defendant Bedrick executed the following stocks sales at times he was in possession of undisclosed negative information about Medbox:

a.      Between September 2, 2014 and October 24, 2014, defendant Bedrick sold approximately 17,490 shares of Medbox stock at prices between $8.00 and $11.30 per share for total proceeds of approximately $170,780.   These sales were defendant Bedrick's first ever publicly reported sales of Medbox stock and they were all executed at times when defendant Bedrick, due to his membership of Medbox's Board, knew of the DOJ subpoenas.   Moreover, all of these sales occurred before the existence of the DOJ subpoenas was publicly disclosed.   The proceeds of these improper insider sales were greater than defendant Bedrick's salary for 2014.

138.    Defendant Lowe executed the following stocks sales at times he was in possession of undisclosed negative information about Medbox:

a.      Between September 2014 and October 31, 2014, defendant Lowe sold 26,900 shares of Medbox stock for proceeds of approximately $270,000 at artificially inflated prices between $8.20 and $14.00 per share.   These sales were Lowe's first ever publicly reported sales of Medbox stock.   At the time of these sales, as a member of the Board, defendant Lowe knew of the DOJ subpoena, which had not been publicly disclosed.

b.      Defendant Lowe's stock sales between November 2014 and December 2014 of 16,000 shares of Medbox stock for proceeds over $155,000, occurred at times when he was a member of the Special Committee investigating the wrongdoing at issue in the DOJ and SEC investigations.   As alleged in the Board's January 2015 complaint against Mehdizadeh, the Special Committee did in fact uncover evidence of accounting manipulation and other wrongdoing.   This had not been disclosed when defendant Lowe executed the stock sales.

139.    Defendant Siegel executed the following stocks sales at times he was in possession of undisclosed negative information about Medbox.

a.      Between September 2014 and October 31, 2014, defendant Siegel sold 30,000 shares of Medbox stock at artificially inflated prices between $8.20 and $14.00 per share

for total proceeds of over $301,000.  At the time of the sales, defendant Siegel was aware of the DOJ subpoena which had not been disclosed publicly.  These were defendant Siegel's first ever publicly reported sales of Medbox stock.

        b.      Defendant Siegel's stock sales between November 2014 and December 2014 of 16,000 shares of Medbox stock for proceeds over $155,000, occurred at a time when he was a member of the Special Committee investigating the wrongdoing at issue in the DOJ and SEC investigations.  As alleged in the Board's January 2015 complaint against Mehdizadeh, the Special Committee did in fact uncover evidence of accounting manipulation and other wrongdoing.  This had not been disclosed when defendant Lowe executed the stock sales

## DAMAGES TO THE COMPANY

      140.    Medbox has been, and will continue to be, severely damaged and injured by defendants' misconduct.  As a direct and proximate result of the defendants' conduct, Medbox has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

        a.      a decreased ability to obtain financing to sustain continued operations at a loss;

        b.      costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

        c.      costs incurred in incentive and/or bonus compensation paid to employees based on artificially inflated test accession numbers;

        d.      substantial loss of market capital;

        e.      costs already incurred and to be incurred defending against the pending securities class action;

        f.      costs already incurred defending government investigations, subpoenas, and suits; and

        g.      any fines that are a result of the Company's violations federal and state law.

141.   In addition, Medbox's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.   The Company has still not fully admitted the nature of its false statements and the true condition of its business.   The credibility and motives of management are now in serious doubt.

142.   The actions complained of herein have irreparably damaged Medbox's corporate image and goodwill.   For at least the foreseeable future, Medbox will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Medbox's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

143.   Plaintiffs bring this action derivatively in the right and for the benefit of Medbox to redress injuries suffered, and to be suffered, by Medbox as a direct result of breaches of fiduciary duty by the individual defendants.   Medbox is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

144.   The Demand Board of Medbox consists of the following four defendants: Siegel, Lowe, Marsala, and Love.   Plaintiffs have not made any demand on the Board to institute this action because a pre-suit demand on the Demand Board would have been futile, and therefore, excused.   This is because the Demand Board members were appointed unilaterally by defendant Mehdizadeh and have failed to hold him accountable in the face of his serious wrongdoing. Thus, demand on the Board was futile, and therefore excused.

145.   Demand is excused as to the Demand Board because it has failed to convene a functioning, properly composed Audit Committee.   The Audit Committee charter requires that the Committee be comprised of *three* independent directors.   However, in violation of the charter, the Medbox Audit Committee is, and was, comprised of only two: defendants Siegel and Love. Because Medbox is beset by accounting problems and has disseminated numerous obviously false and/or misleading financial statements, the Company is in desperate need of a functioning Audit

---

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

Committee.  However, the Demand Board declined to constitute a properly constituted Audit Committee.  As a result, demand is excused as to the entire Demand Board.

**Demand Is Excused Because A Majority Of The Demand Board Faces A Substantial Likelihood Of Liability Based Upon Their Actions**

**Defendant Marsala Is Not Independent**

146.  Defendant Marsala was incapable of considering a demand to take action in an independent and disinterested manner because he is employed fulltime as Medbox's CEO.  As a result, he was reliant on the good will of his other Board members to maintain his primary employment.

147.  Further, during the third quarter of 2014, defendant Marsala received 20,000 shares from defendant Mehdizadeh out of his personal holdings to compensate defendant Marsala for his performance.  On October 24, 2014, the Compensation Committee of the Board recommended that shares be returned to the founder and issued by the Company as part of the yearly RSU grant. In November 2014, defendant Marsala returned 20,000 shares to defendant Mehdizadeh and 20,000 additional shares were approved to increase defendant Marsala's first year RSU grant from 50,000 RSU's to 70,000 RSU's.

148.  Due to the foregoing, defendant Marsala lacked independence from his fellow board members and was beholden to defendant Mehdizadeh.  As a result, defendant Marsala could not independently and disinterestedly consider a demand for action and demand is excused as to him.

**Defendants Siegel, Lowe, and Marsala Are Beholden To Defendant Mehidzadeh**

149.  Defendants Siegel, Lowe, and Love are beholden to Defendant Mehdizadeh as a result of entering into the January 21, 2015 Settlement Agreement and entrenching themselves in their current positions for a year starting from January 21, 2015.  As a result, defendants Siegel, Lowe, and Love could not disinterestedly and independently consider a demand for action against defendant Mehdizadeh and, as a result, demand is excused as to them.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

**Audit Committee Defendants Love And Siegel Breached Their Fiduciary Duties**

150.    Defendants Love and Siegel are the members of the Audit Committee of Medbox. In this capacity, they have responsibility for overseeing the adequacy of the Company's internal controls over financial disclosure, and reviewing its financial statements and press releases. However, even though these defendants *know* the Company has issued misleading financial statements in the recent past and *know* that Medbox's internal controls have failed to prevent accounting manipulation, they have disclosed no specific action to strengthen Medbox's internal controls or taken action against Mehdizadeh and/or Bedrick to recoup financial damages for the harm suffered by the Company.  Moreover, defendants Love and Siegel operated the Audit Committee knowing that it was not properly composed and functioning, and declined to properly compose it and require it to function properly.  As a result, demand is excused as to defendants Siegel and Love due to their breaches of fiduciary duties as Audit Committee members.

**Compensation Committee and Governance and Nominating Committee Defendants Siegel and Lowe Breached Their Fiduciary Duties**

151.    Defendants Siegel and Lowe are the members of the Compensation Committee and the Governance and Nominating Committee.  Both of these defendants serve not only on the Demand Board, but also were members of Boards 2 and 3.  Because both Siegel and Lowe have served on Medbox's Board since approximately April of 2014, they have long been aware of the serious accounting and disclosure problems at Medbox.  Nevertheless, they approved excessive and indefensible salaries for defendant Mehdizadeh in their capacities as Compensation Committee members – even though they knew him to be engaged in wrongdoing, as was evident from conflicting financial statements, the DOJ and SEC investigations, and his issuance of misleading press releases.  Moreover, in their capacities as Governance and Nominating Committee members, defendants Siegel and Lowe failed to conduct adequate evaluations of the Company's corporate governance processes and failed to institute functioning corporate governance policies even though they knew the Company was in desperate need of them.  As a result, demand is excused as to defendants Siegel and Lowe due to their breaches of fiduciary

1  duties in their capacities as members of the Compensation Committee and Governance and
2  Nominating Committee.

3  **Prior-Serving Defendants Marsala, Siegel, and Lowe Breached Their Fiduciary Duties**

4      152.   Defendants Marsala, Siegel and Lowe, a majority of the Demand Board, were on
5  the Board in August 2014 when they were alerted to the DOJ grand jury investigation of
6  Medbox's financial transactions.  However, these three defendants failed to *take any action at all*
7  to investigate or disclose same for three months.   They did, however, approve excessive
8  compensation for defendants Bedrick and Mehdizadeh in August and October of 2014,
9  respectively, even though they knew the DOJ investigation implicated Mehdizadeh and they knew
10 that the Company's financial statements from the time defendant Bedrick was CEO had been
11 misleading.   Likewise, defendants Marsala, Siegel, and Lowe failed to convene an Audit
12 Committee at all until October 2014, let alone a properly comprised one, which still does not exist,
13 even though they were aware of the allegations regarding the Company's financial statements, the
14 DOJ grand jury investigation, and the SEC whistleblower complaint.   As a result, demand is
15 excused as to defendants Marsala, Siegel, and Lowe.

16 **Insider Selling Defendants**

17     153.   Defendants Siegel and Lowe, half of the Demand Board, sold hundreds of
18 thousands of dollars of Medbox stock at times when they were in possession of undisclosed
19 materially negative information about the Company.   These two defendants both executed
20 numerous sales, as detailed above, between August and the end of October 2014, when they knew,
21 but Medbox's shareholders did not, of the DOJ grand jury investigation of the Company's
22 financial statements.   Additionally, these defendants executed numerous sales of Medbox stock
23 between October and the end of December 2014, when they knew the specifics of Mehdizadeh's
24 wrongdoing and the Company's deficient controls but the Company's shareholders did not.   As a
25 result, demand is excused as to these directors because they face a substantial likelihood of
26 liability in connection with these breaches of fiduciary duties.

27
28

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND
ABUSE OF CONTROL

**The Entire Demand Board Breached Its Fiduciary Duties**

154.    Defendants Marsala, Siegel, Lowe, and Love have admitted in Court filings that they are aware of pervasive and serious wrongdoing by defendant Mehdizadeh.  However, they have not sought money damages against him or publicly disclosed any meaningful corporate governance enhancements at Medbox.  In fact, the Demand Board agreed to resolve its suit against defendant Mehdizadeh in return for his promise to let them remain entrenched and immune from challenge as directors.  By their failure to take appropriate action against defendant Mehdizadeh, the entire Demand Board has breached its fiduciary duties and demand is excused as to each member.

155.    As particularized herein, to properly prosecute this lawsuit, the Demand Board members would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions.  This they have refused to do thus far, and will not do in the future.  A majority of the Demand Board members are exposed to potential liability for breaching their fiduciary duties by consciously or recklessly declining to institute functioning internal controls even though they knew or were reckless in not knowing that the Company's internal controls were seriously deficient and accounting chicanery was rampant.  Thus, demand on the Director Defendants is futile.

## COUNT I

### Breach of Fiduciary Duty

156.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Medbox's business and affairs, particularly with respect to maintaining compliance with applicable laws and regulations in core areas of the Company's business, as well as controls over disclosure.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

158.   Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.   Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Medbox.

159.   In breach of their fiduciary duties owed to Medbox, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Medbox's business, rendering them personally liable to the Company for breaching their fiduciary duties.

160.   As a direct and proximate result of defendants' breaches of their fiduciary obligations, Medbox has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Abuse of Control

161.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Medbox, for which they are legally responsible.

163.   As a direct and proximate result of defendants' abuse of control, Medbox has sustained significant damages.

164.   As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Medbox has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, defendants are liable to the Company.

165.   By reason of the foregoing, Medbox has been damaged.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Medbox and that plaintiff is an adequate representative of the Company;

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

B.     Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Medbox;

C.     Determining and awarding to Medbox the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Directing Medbox and the defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Medbox and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     A provision to permit the shareholders of Medbox to nominate at least three candidates for election to the Board;

3.     A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.     Determining and awarding to Medbox exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.     Awarding Medbox restitution from defendants, and each of them;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL

57

Dated: August 25, 2015

MATTHEW L. SHARP, LTD.

/s/ Matthew L. Sharp
Matthew L. Sharp
Nevada Bar No. 4746
432 Ridge Street
Reno, Nevada 89501
Telephone:      (775) 324-1500
Facsimile:      (775) 284-0675
Email: Matt@MattSharpLaw.com

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Telephone:      (212) 935-7400
Facsimile:      (212) 753-3630

THOMAS J. MCKENNA
GREGORY M. EGLESTON
Gainey McKenna & Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone:      (212) 983-1300

*Co-Lead Counsel for Plaintiffs*

LOUIS BOYARSKY
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160

*Attorneys for Plaintiffs*

## VERIFICATION

I, Robert J. Calabrese, declare that I have reviewed the Verified Consolidated Shareholder Derivative Complaint ("Complaint") prepared on behalf of Medbox, Inc. and authorize its filing. I have reviewed the allegations made in the Verified Consolidated Shareholder Derivative Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Medbox, Inc. common stock at all relevant times.

Date: August 25, 2015

ROBERT J. CALABRESE

## MEDBOX, INC. VERIFICATION

I, Tyler Gray, hereby verify that I am familiar with the allegations in the Consolidated Complaint, and that I have authorized the filing of the Consolidated Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.


Date: 8/25/2015

Tyler Gray

**VERIFICATION**

I, Giuseppe Modica, declare that I have reviewed the Verified Consolidated Shareholder Derivative Complaint ("Complaint") prepared on behalf of Medbox, Inc. and authorize its filing. I have reviewed the allegations made in the Verified Consolidated Shareholder Derivative Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Medbox, Inc. common stock at all relevant times.

Date: August 25, 2015

GIUSEPPE MODICA

1